

**Amended Complaint.   18-03199**



**FILED**
JAN 3 1 2019
KATE BARKMAN, Clerk
By_____Dep. Clerk

1. My son Dayontae Hoskins entered Pottstown school district 2013/2014 school year starting first grade.He attended Barth elementary coming from pottsgrove school district completing head start and kindergarten with NO behavior issues, he also has no behavior issues at Barth during this time however we moved and he was transferred to Rupert elementary spring 2014. Not long after being at Rupert Dayontae was assaulted and restrained by principal Moyer and others. Cause of restraint was never determined because there is no official incident report nor was there an official investigation done even though I requested one several times. After this assault Dayontae began to display PTSD like symptoms , never wanting to be touched by Moyer the principle or other staff. He would run away from them and the school when being approached which resulted in more unnecessary physical contact and restraints and also violent out bursts when he felt trapped by them. I distinctly remember being called to school and when I arrived found my s)on crouched in closet crying and Moyer and 4 other staff members surrounding him. I knew then I had to fight to have my son removed from there ! My transfer requests were denied by district and these assaults and issues continued for over a year then I wrote to Pam Bateson head special education to have Dayontae tested and also made pleadings with Dr Sparagana who was superintendent at that time.(**exhibit A**) I again requested that initial restraint be investigated but again that request was ignored . I sent Dr Sparagana email stating all school policies that were being violated by the district (**exhibit A**) There was incident where Moyer called police on me and I refused to bring my son back there . meeting was held Dr Sparagana, Moyer, Bateson , Kizmet Meade (child advocate ) and myself and there it was determined that Dayontae go back to Barth ....but it was too late so much damage had been done.

2. 2015/2016 Dayontae attended Barth for third grade. Principal Oxenford and I communicated regularly and I was under impression that we had good relationship with him and staff at Barth .I was very involved attended every meeting ect. Due to his trauma stemming from Rupert Dayontae still experienced behavior issues at Barth . I was called multiple times from work to pick Dayontae from school because he was forced to leave early on many occasions...some suspensions but most times just asked to leave and later found out that was districts way of not officially suspending because he was now considered special education student and there were certain laws district had to abide by and minimal suspensions were one of those laws.

3. During IEP meeting December 2015 I was blind sided by Pam Bateson and others that I never met before requesting that Dayontae be sent to an institution O refused and Pam Bateson gave alternative and suggested that he be put on medication for his behavior or he would be placed out of district. She continued the meeting allowed me 30 days to take him to psychiatrist. I did what they told me to do because I was afraid of having my son sent away. I started treatment at Progressions behavioral health and Dayontae was prescribed Ritalin and Zoloft . Meeting reconvened end of January and because I put my son on medication like she requested Pam Bateson no longer would send Dayontae away he remained at Barth . For a few months Dayontae did better and the school was pleased I however was not my son was drugged up not himself at home lost weight medication affected his appetite. By summer Dayontae medication dosage had increased and he was still having "issues " at school. By the advisement of another medical profession that I trusted I removed Dayontae from taking the medications she expressed yo me that 100mg of Zoloft is dangerous for an adult and not sure why he was being so heavily medicated. I explained the situation at school and why I took him to progressions and that's when I learned school had no RIGHT to demand, suggest or reference in any manner that I put him medication as a provision to keep him at the school, she told me it was illegal. I told them I no longer wanted him on medicine so (2016) the District called Children and youth with claims of neglect ...these accusations were unfounded by the agency(**exhibit B**)

4. March 2017 Dayontae was illegal not permitted back to school .I sent numerous emails to Oxenford, Rodriguez the superintendent, Mary Oneil head special education and attorney Ms Pierce but my requests went unanswered(**exhibit C**) after weeks of begging I gave up and filed a complaint with Bureau special education it was received on April 17, 2017 and after investigation I prevailed on my complaint and decision June 1, 2017 (**exhibit D**) during the 6 weeks that were found non compliant I endured strenuous financial hardship .I had to take Dayontae to Norristown everyday day to be cared for while I was at work in Reading .I expressed to the district numerous times that he needed to be back in school because he was many grades behind in reading and I simply could not afford this

3.

commute everyday and wouldn't get home until after 8pm sometimes because work ended at 6pm.

5. District offered settlement agreement and part of that agreement was that Dayontae would attend Martin Luther in Plymouth Meeting Pa for 2years that district would be fully responsible for tuition and transportation as well as compensation for travel and inconvenience that I endured I endured during his 6 week absence from school. Agreed enrollment date was October 23. 2017. I took off from work took Dayontae to the school to drop him off and when I arrived was advised that he could not stay because the district did not do all necessary paperwork . I was infuriated because there was am agreement and again I missed work. I immediately dropped Dayontae off at district administration and advised them that they needed to find him schooling because they messed up. Dayontae stayed at administration building for that day.

6. I was contacted by Erin Jacobs that they found alternative place for Dayontae until things with Martin Luther cpukd be resolved and I was to report to a school called Cottage Seven the next morning for brief meeting with principal Brett Wade before heading to work. When arrived initially meeting did not go well because I could already see that Wade was cocky and this place was not right establishment for Dayontae and his needs. I had no choice though because I was on thin ice with my job and had to report to work that day late . Dayontae apparently had his head down crying and Wade thought best way to handle it was to restrain him. This was unacceptable. In email exchange (**exhibit E**) with Wade he admits that he asked me to not bring Dayontae back if Inwas unwilling to agree to his terms on how to handle him I advised Wade that he violated the IEP and should have voiced any concerns with IEP during our initial meeting on 24th.

7. I refused at first to take Dayontae back there because he was afraid but the district threatened me with truancy and said they would not move him . they were afraid of being non compliant again due to their mishap with Martin Luther so they jeopardized my son's well being . Mr Wade called police on my son as well as Children amd Youth services after Dayontae only being at hos school for one day . these claims were false and agency believed it to be false because there was never case opened fpr these allegations only I received a call from agency and after explaining the

4.

situation and what they did and my intentions of filing suit against all these individuals there was no further contact.

8. I filed complaint with ODR and there was fit process hearing that commenced January 3,2018. Staff members Erin Jacobs and others lied during these proceedings and when I brought this to attention of hearing officer he said there was nothing he could do (**exhibit F**)

9. Hearing Officer made his decision on or about May 11, 2018 (**exhibit G**) and I do not agree that these witnesses were credible nor do I agree with decision in its entirety so I exercised my right to appeal this ordera and did so in timely matter which brings this complaint .

10. KimStilwell has lied numerous times after being questioned about her knowledge and involvement .She has repeatedly stated that she knew nothing of my complaints or accusations of discrimination against myself amd my son and us being treated differently, email correspondence proves otherwise and her lies hindered the due process (**exhibit H**)

11. J. Schroeder Also lied @ Due process hearing.

All claims and damages for claims from original/initial complaint are the same and to be added to this amended complaint.

Shaniqua Aponte
P.O. Box 102
Pottstown PA 19464
484-300-0042

EXHIBIT - A

 Gmail

Shanicqua Aponte <nicqua8212@gmail.com>

## Fw: Dayontae Hoskins
2 messages

**Shanicqua Suber** <nicqua8212@yahoo.com>                                      Tue, Jan 2, 2018 at 4:38 AM
Reply-To: "nicqua8212@yahoo.com" <nicqua8212@yahoo.com>
To: Shanicqua Aponte <nicqua8212@gmail.com>

Sent from Yahoo Mail on Android

----- Forwarded Message -----
From: "Shanicqua Suber" <nicqua8212@yahoo.com>
To: "jsparaga@pottstownsd.org" <jsparaga@pottstownsd.org>
Cc: "mmoyer@pottstownsd.org" <mmoyer@pottstownsd.org>, "pbateson@pottstownsd.org"
<pbateson@pottstownsd.org>
Sent: Tue, Mar 31, 2015 at 3:32 PM
Subject: Dayontae Hoskins
Hello, I know that we spoke earlier about an incident concerning Mr. Moyer and how I
was treated and lied to , straight to my face because he refused to give me paperwork
that I am entitled to. There has been another incident today where my son was
pushed by two other boys, so he got upset and threatened them. My son was the only
one that "got in trouble" Mr. Moyer did not once try to figure out what was going on or
talk to ALL of the boys about keeping their hands to themselves, all he was concerned
about is that my son became upset that he was pushed on. The conversation between
Mr Moyer and I didn't go well, first of all because he refuses to apologize for lying to
me last week , but he says he did nothing wrong. So before you try teaching young
children right and wrong, and owning up to their actions then you, Dr. Sparagana ,
need to first teach your staff the same as well. First Mrs Bateson, now Mr Moyer, I will
not be disrespected and talked down to any longer by your staff, I will from now on
show them the same respect that they show me.
I want my son out of that school, I have asked you this last year but you refused. Mr
Moyer is targeting my son, and I will be bringing this up at the next school board
meeting, it has dragged on way too long now, a whole year.

Mrs. Aponte

**Shanicqua Suber** <nicqua8212@yahoo.com>                                      Tue, Jan 2, 2018 at 4:39 AM
Reply-To: "nicqua8212@yahoo.com" <nicqua8212@yahoo.com>
To: Shanicqua Aponte <nicqua8212@gmail.com>

Sent from Yahoo Mail on Android

| | |
|---|---|
| **Subject** | Re: Meeting scheduled for 4/16 |
| **From** | Kizmect Meade <kmeade@mhasp.org> |
| **To:** | pbateson@pottstownsd.org <pbateson@pottstownsd.org> |
| **Cc:** | nicqua8212@yahoo.com <nicqua8212@yahoo.com>, jsparaga@pottstownsd.org <jsparaga@pottstownsd.org> |
| **Date** | Thu, Apr 16, 2015 at 10:06 AM |

Good morning! Mrs. Aponte is correct the meeting was to be scheduled and an e-mail sent to both mom and myself about the date and time of the meeting.

Kizmect Meade

On Thu, Apr 16, 2015 at 9:23 AM, Pam Bateson <pbateson@pottstownsd.org> wrote:

Mrs. Aponte,

I do apologize if I dropped the ball on this.  I had recalled that we had already agreed on this date and time.  If I was mistaken about this, it was unintentional.

If you are unable to meet this afternoon, I would be happy to reschedule the team meeting for next week.

In the meantime, due to the delays, I will have a Permission to Evaluate issued within the next day.

It would be very helpful and informative for the process of the evaluation to have your input and a full team determination about what Dayontae's perceived educational needs are.

Please let me know if any of the following times work for you:

Monday, 4/20/15 at 2:00

Wednesday, 4/22 at 2:00

Friday, 4/24 at 11:00

Thank you, and please let me know if there are questions when you receive the paperwork.

Sincerely,

Pamela Bateson
Director of Special Education & Student Services
Pottstown School District
610-970-6688
Fax: 610-323-9307

**There can be no keener revelation of a society's soul than the way in which it treats its children.**
Nelson Mandela

Confidentiality Notice: This email message, including any attachments, is for the sole use of the

Re: policy violations

## Re: policy violations

Jeff Sparagana

**Sent:** Sunday, April 12, 2015 8:52 PM

**To:** Shanicqua Suber [nicqua8212@gmail.com]

**Cc:** Judyth Zahora; Andrew Kefer; Katina Bearden; Kimberly Stilwell; Matthew D. Moyer

Mrs. Aponte

I called in attempt to speak with you on Friday afternoon but had to leave you a voicemail.   I also called you today, Sunday, and had to leave you a voicemail.

I will try again to contact you tomorrow.

Jeff

Sent from my iPhone, Jeff Sparagana
Superintendent of Schools
Pottstown School District

On Apr 12, 2015, at 4:45 PM, Shanicqua Suber <nicqua8212@gmail.com> wrote:

> After having the police called on me by Moyer at Rupert and then being charged with trespassing, I went through all board policies and found that they have been broken and not followed on numerous occasions when it came to dealing my son and I. I am going to list all that I feel have been violated throughout the past twelve months, even after I constantly complained and have written you greivences and ... logging for your help in all situations. You have done minimal to fix the situation and have chose to take and defend your colleagues instead of doing what is right for the continued education for my son while in the Pottstown School District. The District has infringed on my Constitutional Civil liberties and you have allowed your staff to continue to inflict intentional emotional distress that was clearly unwarranted. I feel these actions by Moyer were clearly motivated, I was clearly in my right to ask for and posses, upon leaving the school with my child, a written notice explanation of why he is suspended and for how long. I repeatedly asked for this in writing and Moyer refused and when I told him that I was not leaving without it, he calls the police.

Title 22
Sec. 12.6, 12.7,
14:143
20 U.S.C.
Sec. 1400 et seq
34 CFR
Part 300
my son is legally disabled, determined by the state of Pennsylvania, and this law is not limited to only physical handicaps

SC 1318 Title 22 SEC 12.6
says that parent is to be i...

Re: policy violations

section 225 in relation to law enforcement
there were threats made to staff or students to warrant Moyer to call the police

section 219 student complaint process
Since my son is now only 8 years old, and at the time all this started he was 6 years old, I have taken the responsibility to make these complaints on his behalf and they have fallen on death ears

section 002 Authority and Powers of the School Board

I am asking that the board look into allegations of policy violations by Moyer the principal at Rupert and the Superintendent of the Pottstown School District Dr Sparagana

thank you

Mrs Aponte
4843000042

**Mail body: Fwd:**

---------- Forwarded message ---------
From: **Shanicqua Suber** <nicqua8212@gmail.com>
Date: Wed, Mar 18, 2015, 10:13 AM
Subject:
To: <jzahora@pottstownsd.org>


Can you please contact me @484-300-0042, I am having issues with this district that have stretched for over a year now. Dr Sparagana is well aware of the disrespect his staff has towards me as well as the unprofessionalism conduct that has occurred, followed by no apologies. My son is now afraid to return to school . I have reached out to other members of school board throughout this situation and ending with you the president before taking further possible legal recourse .

Mrs Aponte

EXHIBIT - B

 **pennsylvania**
DEPARTMENT OF HUMAN SERVICES

Mailing Date: 11/21/2016

SHANICQUA S. SUBER
204 N YORK ST
2ND FL
POTTSTOWN, PA 19464

**Child: DAYONTAE HOSKINS**
**Report No.:7716742**
**Status: Unfounded**
**Agency: Montgomery County Office of**
**Children and Youth**

Dear SHANICQUA S. SUBER:

The above named child was reported as a victim of suspected child abuse.

The agency listed above has investigated the report and determined it was Unfounded because of one of the following: (1) the incident did not occur, (2) the injury was not of a serious nature, or (3) substantial evidence was not found.

This is notification that the above-listed report will be expunged by this office as required by the Child Protective Services Law (CPSL) § 6337 (a) that states, when a report of suspected child abuse is determined by the appropriate county agency to be an unfounded report, the information concerning that report of suspected child abuse shall be maintained for a period of one year. The report shall be expunged from the Unfounded Reports File within the Statewide Database, no later than 120 days after the one-year period from the date the report was received by the department. The law restricts use of information in Unfounded reports until they are destroyed. Unfounded reports are not referenced when staff performs background checks or prior history searches for new abuse/neglect reports.

If the investigation reveals that the child and family are in need of social services and the agency has accepted the family for services, the report will clearly be identified as an unfounded child abuse report. The report will be retained within the Statewide Database and expunged as required by the CPSL § 6337(c) that states when a county agency has accepted the family for services, the report shall remain in the Statewide Database until the family case has been closed. The report shall than be expunged no later than 120 days after the one-year period following the date of closure. If the subject child becomes 23 years of age prior to the case closure, the unfounded report will be expunged at that time.

This letter is the only notice of expunction you will receive from our office, so please retain it for your records. The CPSL has no provision to appeal either the existence of unfounded reports or their expunction by the Department of Human Services or the county agency.

ChildLine and Abuse Registry
Office of Children, Youth and Families
P.O.Box 2675 | Harrisburg, PA 17105 | 717.783.1964 | F 717.772.6857 | www.dhs.state.pa.us



EXHIBIT - C

**Mail body: Fwd: Isolation**

---

---------- Forwarded message ---------
From: **Shanicqua Aponte** <nicqua8212@gmail.com>
Date: Wed, Feb 22, 2017, 3:25 PM
Subject: Isolation
To: Ryan Oxenford <roxenfor@pottstownsd.org>
Cc: michael Walker <michael@mawesquire.com>

It was just brought to my attention that my son Dayontae Hoskins does not eat lunch with the other children but instead is isolated in a classroom to eat.  Can you please tell me how long this has been going on, by whom and when was this decided?

Mrs Aponte



## Return to school
1 message

**Shanicqua Aponte** <nicqua8212@gmail.com>
To: Ryan Oxenford <roxenfor@pottstownsd.org>

Tue, Mar 28, 2017 at 10:47 AM

Hello, I'm waiting for response from someone, anyone?!
[Quoted text hidden]

11



## Return to school
1 message

**Shanicqua Aponte** <nicqua8212@gmail.com>
To: Ryan Oxenford <roxenfor@pottstownsd.org>
Cc: michael Walker <michael@mawesquire.com>, Mary O'Neill <moneill@pottstownsd.org>

Mon, Mar 27, 2017 at 1:15 PM

Good afternoon,  im writing to inform you that dayontae Hoskins needs to be back in school asap soon as possible.  He is not receiving education at all has missed several weeks of school.  Already at second grade reading level. I  would like to request Aid be in class with him and if this is provided by the school district. In the meantime I would appreciate that necessary paperwork is done to get him in school right away.

Thank you
Mrs Aponte

10



## Incident 2-17

1 message

**Shanicqua Aponte** <nicqua8212@gmail.com>
To: Ryan Oxenford <roxenfor@pottstownsd.org>                    Fri, Feb 17, 2017 at 9:58 PM
Cc: michael Walker <michael@mawesquire.com>, Mary O'Neill <moneill@pottstownsd.org>

Hello, I understand that you may not understand why my son Dayontae gets upset over things that you may think is miniscule, however threatening to call the police on him today is inexcusable and provoking. You're very comfortable with threatening with that action, you've done it to me numerous times difference is im not afraid, but he is and he's 9 years old. Also you claim that he threatened to harm himself, yet when he was picked up today she witnessed him barricaded in a room by himself and noone in there, three ppl blocking door so he couldn't leave. She also said that he was very upset when you walked her into the room but calmed down instantaneously when you were asked to leave the room so she could talk to him. This started from you calling him a liar (dayontae words) and by your own admission you stated to me that you said that you didn't believe him and wanted him to apologize to the other boy when by your own admission said they were both shoving one another.

I will take this opportunity to again , for the 4th time, request the name of the person who you say provided you with the information to change his IEP crisis plan .

Mrs Aponte

$q$

**Mail body: Fwd: Avoidance**

---------- Forwarded message ---------
From: **Shanicqua Aponte** <nicqua8212@gmail.com>
Date: Mon, Feb 6, 2017, 11:59 AM
Subject: Avoidance
To: Mary O'Neill <moneill@pottstownsd.org>

I arrived at administration building while you were in car parking lot.  Waited a few minutes then asked for you but was told that you weren't in. I saw you there. My son is still not being allowed to return to school and because of this suspension he has now been removed from his after school COPE through creative health. You are supposed to be in charge of special education so not sure of how you're allowing this illegal suspension by the school district to continue.

Mrs Aponte

**Mail body: Fwd: Kept out of school**

---------- Forwarded message ---------
From: **Shanicqua Aponte** <nicqua8212@gmail.com>
Date: Wed, Feb 1, 2017, 10:57 AM
Subject: Kept out of school
To: Pierce, Shannon R. <spierce@foxrothschild.com>


Good morning,
I have on numerous occasions including yesterday requested from Ryan oxenford as well as Ms O'Neil,  documentation regarding days that my son Dayontae Hoskins was not permitted to be at school but wasn't suspended. Oxenford has kept him out of school and has even "classified "one as medical,  but he's not a doctor nor has any doctor ever directed him to be out for medical reasons .
Since oxenford will not comply to supply me with this documentation,  I am requesting it from you . Ms O'Neil has informed me that she is only privy to records that are documented,  not to oxenford personal school activity.

Thank you
Mrs Aponte



## Police
1 message

**Shanicqua Aponte** <nicqua8212@gmail.com>                    Wed, Feb 8, 2017 at 12:21 PM
To: Mary O'Neill <moneill@pottstownsd.org>

Police were called on my son today,  school called me at 10:30, called noone else on crisis, and actually called police before calling me. I would like timeline of events that led to this this morning. Again boy Zahir was mentioned not sure of specifics but I do know that crisis plan again is not followed and oxenford is getting real comfortable with calling police on black children

Mrs Aponte

12

**Mail body: Fwd: Suspension**

---------- Forwarded message ---------
From: **Shanicqua Aponte** <nicqua8212@gmail.com>
Date: Thu, Feb 2, 2017, 10:36 AM
Subject: Suspension
To: Mary O'Neill <moneill@pottstownsd.org>

My son is being discriminated against. He was suspended I received suspension letter in mail that says reinstatement meeting must be held prior to end of suspension but no date was given and then says that he would be marked illegal absence afterwards.  How is this right? When date is TBD, why is he being treated differently than others?

EXHIBIT - D

Pottstown School District
Elizabeth B. Barth Elementary School
Pottstown

PUPIL SUSPENSION NOTICE

Dear: Ms. Aponte,

Your son/daughter, **Dayontae Hoskins**, has been suspended *out of school,* as a pupil at the Elizabeth B. Barth Elementary School.

The suspension is effective for a period of **3 school days**, beginning, **1/30/17** and ending, **2/02/17**. During this period of time, or until re-admitted by the principal, your child may not attend school, participate in or attend any school activities, and may not be on school property.

Your son/daughter has been suspended from school for the following reason:

- Repeated aggressive and dangerous behavior towards staff members.

**Reinstatement meeting is TBD.**

**Important note:** Before your child will be re-admitted to school, you and your child must attend the reinstatement meeting with the principal. This conference must take place prior to the last day of the period of suspension. Otherwise your child will not be re-admitted to school and will be classified illegally absent following the last day of the suspension period.

Please contact the school if you are unable to attend the reinstatement meeting to discuss your child's suspension from school. The school telephone number is (610) 970-6676.

Sincerely,

Principal



S   ID: 6009866   **Name:** Hoskins, Dayontae James   :   **Building:** E. B. Barth Elementary School   **Grade:** 04



## Student Attendance Report

| Date | Period | Code | Arrive Time | Dismiss Time | Comment |
|------|--------|------|-------------|--------------|---------|
| 9/21/2016 | HR | TE - Tardy Excused | 8:56 AM | | |
| 9/28/2016 | HR | TE - Tardy Excused | 8:56 AM | | |
| 10/4/2016 | HR | SO - Out of School Suspension | | | |
| 10/14/2016 | HR | EH - Excused Half Day | | | |
| 10/17/2016 | HR | SO - Out of School Suspension | | | sent home 12:30 |
| 10/18/2016 | HR | AL - Unlawful Absence | | | |
| 10/24/2016 | HR | AE - Excused Absence | | | |
| 10/25/2016 | HR | AE - Excused Absence | | | left 11:00 |
| 10/26/2016 | HR | AL - Unlawful Absence | | | |
| 11/7/2016 | HR | EH - Excused Half Day | | | no excuse rtn |
| 11/8/2016 | HR | SO - Out of School Suspension | | | left 11:50 |
| 11/9/2016 | HR | SO - Out of School Suspension | | | |
| 11/10/2016 | HR | SO - Out of School Suspension | | | |
| 12/2/2016 | HR | TE - Tardy Excused | 8:58 AM | | |
| 12/15/2016 | HR | TE - Tardy Excused | 9:16 AM | | |
| 1/10/2017 | HR | TE - Tardy Excused | 8:56 AM | | |
| 1/18/2017 | HR | TE - Tardy Excused | 8:58 AM | | |
| 1/19/2017 | HR | TE - Tardy Excused | 8:57 AM | | |
| 1/20/2017 | HR | TE - Tardy Excused | 8:57 AM | | |
| 1/23/2017 | HR | TE - Tardy Excused | 9:08 AM | | |
| 1/24/2017 | HR | TE - Tardy Excused | 8:56 AM | | |
| 1/30/2017 | HR | SO - Out of School Suspension | | | |
| 1/31/2017 | HR | SO - Out of School Suspension | | | |
| 2/1/2017 | HR | SO - Out of School Suspension | | | |
| 2/2/2017 | HR | AE - Excused Absence | | | |
| 2/6/2017 | HR | AE - Excused Absence | | | |
| 2/8/2017 | HR | EH - Excused Half Day | | | |
| 2/10/2017 | HR | SO - Out of School Suspension | | | picked up at 11:55 |
| 2/17/2017 | HR | EH - Excused Half Day | | | |
| 2/22/2017 | HR | EH - Excused Half Day | | | picked up 1:32 |
| 2/23/2017 | HR | SO - Out of School Suspension | | | picked up 1:30 |
| 2/24/2017 | HR | AE - Excused Absence | | | |
| 2/27/2017 | HR | AE - Excused Absence | | | |
| 2/28/2017 | HR | AE - Excused Absence | | | |
| 3/1/2017 | HR | AE - Excused Absence | | | |
| 3/2/2017 | HR | AE - Excused Absence | | | |
| 3/3/2017 | HR | AE - Excused Absence | | | |
| 3/6/2017 | HR | AE - Excused Absence | | | |
| 3/7/2017 | HR | AE - Excused Absence | | | |

| | | |
|---|---|---|
| 3/8/2017 | HR | AE - Excused Absence |
| 3/9/2017 | HR | AE - Excused Absence |
| 3/10/2017 | HR | AE - Excused Absence |
| 3/13/2017 | HR | AE - Excused Absence |
| 3/15/2017 | HR | AE - Excused Absence |
| 3/16/2017 | HR | AE - Excused Absence |
| 3/20/2017 | HR | AE - Excused Absence |
| 3/21/2017 | HR | AE - Excused Absence |
| 3/22/2017 | HR | AE - Excused Absence |
| 3/23/2017 | HR | AE - Excused Absence |
| 3/24/2017 | HR | AE - Excused Absence |
| 3/27/2017 | HR | AE - Excused Absence |
| 3/28/2017 | HR | AE - Excused Absence |
| 3/29/2017 | HR | AE - Excused Absence |
| 3/30/2017 | HR | AE - Excused Absence |
| 3/31/2017 | HR | AE - Excused Absence |
| 4/3/2017 | HR | AE - Excused Absence |
| 4/4/2017 | HR | AE - Excused Absence |
| 4/5/2017 | HR | AE - Excused Absence |
| 4/6/2017 | HR | AE - Excused Absence |
| 4/7/2017 | HR | AE - Excused Absence |
| 4/10/2017 | HR | AE - Excused Absence |
| 4/11/2017 | HR | AE - Excused Absence |
| 4/12/2017 | HR | AE - Excused Absence |
| 4/18/2017 | HR | AE - Excused Absence |
| 4/19/2017 | HR | AE - Excused Absence |
| 4/20/2017 | HR | AE - Excused Absence |
| 4/21/2017 | HR | AE - Excused Absence |
| 4/24/2017 | HR | AE - Excused Absence |
| 4/25/2017 | HR | AE - Excused Absence |
| 4/26/2017 | HR | AE - Excused Absence |
| 4/27/2017 | HR | AE - Excused Absence |
| 4/28/2017 | HR | AE - Excused Absence |
| 5/1/2017 | HR | AE - Excused Absence |
| 5/2/2017 | HR | AE - Excused Absence |
| 5/3/2017 | HR | AE - Excused Absence |
| 5/4/2017 | HR | AE - Excused Absence |
| 5/5/2017 | HR | AE - Excused Absence |

**Total Days with Attendance:** 77    **Total Attendance Records:** 77



# PENNSYLVANIA DEPARTMENT OF EDUCATION
## BUREAU OF SPECIAL EDUCATION
## COMPLAINT INVESTIGATION REPORT



received
6-5-17 MKO

**LOCAL EDUCATION AGENCY:**        Pottstown School District

**DATE RECEIVED:**        April 17, 2017

**DATE OF REPORT:**        June 1, 2017

**COMPLAINANT:**        Parent

*extension until 8.15.17 MO*

**NAME:**
**ADDRESS:**        Shanicqua S. Aponte
P.O. Box 102
Pottstown, PA 19464

**RE:**        Dayontae Hoskins

## SPECIFIC COMPLAINTS:

Issue 1:  The Pottstown School District (District) did not follow the crisis plan in the Individualized Education Program (IEP) this school year, by contacting law enforcement before contacting the Parent when the Student experienced behavior issues.

Issue 2:  The District revised the IEP without ensuring the Parent's participation this school year.

Issue 3:  The District did not provide the Student a Free Appropriate Public Education (FAPE) during the time the Student has been out of school, from March 23, 2017, to the present.

## APPLICABLE REGULATORY AUTHORITY:

Issue 1:

§ 14.133. Positive behavior support.(a) Positive, rather than negative, measures must form the basis of behavior support programs to ensure that all students and eligible young children shall be free from demeaning treatment, the use of aversive techniques and the unreasonable use of restraints. Behavior support programs must include research based practices and techniques to develop and maintain skills that will enhance an individual student's or eligible young child's opportunity for learning and self-fulfillment. Behavior support programs and plans must be based on a functional assessment of behavior and utilize positive behavior techniques. When an intervention is needed to address problem behavior, the types of intervention chosen for a particular student or eligible young child shall be the least intrusive necessary. The use of restraints is considered a measure of last resort, only to be used after other less restrictive measures, including de-escalation techniques, in accord with subsection (c)(2).

(h) Subsequent to a referral to law enforcement, for students with disabilities who have positive behavior support plans, an updated functional behavior assessment and positive behavior support plan shall be required.

Issue 2:

34 CFR Individuals with Disabilities Education Act (IDEA) § 300.322 Parent participation.
(a) Public agency responsibility-general. Each public agency must take steps to ensure that one or both of the parents of a child with a disability are present at each IEP Team meeting or are afforded the opportunity to participate, including--
(1) Notifying parents of the meeting early enough to ensure that they will have an opportunity to attend; and
(2) Scheduling the meeting at a mutually agreed on time and place.
(c) Other methods to ensure parent participation. If neither parent can attend an IEP Team meeting, the public agency must use other methods to ensure parent participation, including individual or conference telephone calls, consistent with Sec. 300.328 (related to alternative means of meeting participation).
(d) Conducting an IEP Team meeting without a parent in attendance. A meeting may be conducted without a parent in attendance if the public agency is unable to convince the parents that they should attend. In this case, the public agency must keep a record of its attempts to arrange a mutually agreed on time and place, such as--
(1) Detailed records of telephone calls made or attempted and the results of those calls;
(2) Copies of correspondence sent to the parents and any responses received; and
(3) Detailed records of visits made to the parent's home or place of employment and the results of those visits.

§ 300.324 Development, review, and revision of IEP.
(a) Development of IEP
(4) Agreement. (i) In making changes to a child's IEP after the annual IEP Team meeting for a school year, the parent of a child with a disability and the public agency may agree not to convene an IEP Team meeting for the purposes of making those changes, and instead may develop a written document to amend or modify the child's current IEP.
(ii) If changes are made to the child's IEP in accordance with paragraph (a)(4)(i) of this section, the public agency must ensure that the child's IEP Team is informed of those changes.
(5) Consolidation of IEP Team Meetings. To the extent possible, the public agency must encourage the consolidation of reevaluation meetings for the child and other IEP Team meetings for the child.
(6) Amendments. Changes to the IEP may be made either by the entire IEP Team at an IEP Team meeting, or as provided in paragraph (a)(4) of this section, by amending the IEP rather than by redrafting the entire IEP. Upon request, a parent must be provided with a revised copy of the IEP with the amendments incorporated.
(b) Review and revision of IEPs.
(1) General. Each public agency must ensure that, subject to paragraphs (b)(2) and (b)(3) of this section, the IEP Team--
(i) Reviews the child's IEP periodically, but not less than annually, to determine whether the annual goals for the child are being achieved.

Issue 3:

§ 300.101 Free appropriate public education (FAPE).
(a) General. A free appropriate public education must be available to all children residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school, as provided for in Sec. 300.530(d).

## SOURCES OF INFORMATION:

This Adviser:

2

A.  Reviewed the complaint letter and spoke to the Parent on April 17, 2017.

B.  Contacted the Mary O'Neil, Special Education Director (Director) on April 17, 2017.

C.  Interviewed the following staff on May 4, 2017:

- Director
- Ryan Oxenford, Principal
- Mieke Mazur, School Psychologist
- Dulce Rothermel, Elementary Special Education Supervisor
- Meghan Walsh, Special Education Teacher

D.  Reviewed the following numbered records:

| Rec | Title | Date | Source |
|-----|-------|------|--------|
| 1. | Attendance Record | 2016 to 2017 | District |
| 2. | Case Contact Log | 2016 to 2017 | District |
| 3. | Invitations to Participate in the IEP team meeting | November 11, 2016; April 19, 2017 | District |
| 4. | IEP; crisis plan | October 14, 2015; October 26, 2016; November 9, 2016; January 30, 2017; April 24, 2017 | District |
| 5. | Notice of Recommended Educational Placement/Prior Written Notice (NOREP/PWN) | October 14, 2015; October 26, 2016; May 1, 2017 | District |
| 6. | Email correspondence between the Parent and District staff | 2016 to 2017 | Parent; District |
| 7. | Suspension records | 2016 to 2017 | Parent; District |
| 8. | Complaint Letter | April 13, 2017 | Parent |
| 9. | District response to Complaint | April 21, 2017 | District |
| 10. | Progress Reports | 2016 to 2017 | District |
| 11. | Report Cards | 2016 to 2017 | District |

## FINDINGS:

Issue 1:

1.  The Student was receiving itinerant learning support (I/LS) at the Barth Elementary School (Barth) in the fourth grade during this school year.

2.  The IEP includes specially designed instruction (SDI) listing teacher check-ins each day, and 30 minutes per week of social skills group.

3.  The Special Education Teacher stated the check-ins consisted of approximately 30 minutes in the morning and 10 minutes in the afternoon, totaling 40 minutes per day.

4. The IEP includes a Positive Behavior Support Plan (PBSP) and a crisis plan.

5. Among the steps in the crisis plan:

   - Staff implement strategies to calm the Student
   - Call the Parent if unsuccessful
   - If unavailable, call additional emergency contacts
   - If unavailable, call family contacts
   - If unavailable, call agency case manager
   - If unavailable, call Montgomery County Children's Crisis Center
   - If unavailable, call 911 for medical emergency personnel

6. On February 8, 2017, the Principal stated the Student escalated too quickly to follow each step in the crisis plan, and presented an immediate danger to self and others; therefore, the principal contacted law enforcement.

7. The incident did not result in a restraint or in arrest.

8. The Director stated that the practice in the District is to review incidents resulting in suspension at the reinstatement meeting.

9. The Functional Behavioral Assessment (FBA) and PBSP were not updated following the contact to law enforcement.

Issue 2:

1. The Special Education Teacher's log documents multiple phone calls to the Parent to schedule the annual IEP team meeting to accommodate schedules of the Parent and school staff.

2. The email correspondence between the Parent and the Special Education Teacher documents attempts to schedule an IEP team meeting within the annual IEP timeline.

3. The IEP team met to develop the annual IEP on October 26, 2016, indicating the Parent was not available at that time.

4. The Special Education Teacher's log documents multiple additional phone calls to the Parent to reschedule the IEP team meeting at a time the Parent's advocate could attend.

5. The November 7, 2016, invitation lists November 11, 2016 as the date for the IEP team meeting.

6. The IEP team did not meet because the Parent's legal counsel advised the Parent not to attend the meeting.

7. The Director stated that an emergency contact person listed in the IEP provided updated contact information for the Student's grandmother during an emergency situation on January 30, 2017.

8. The Parent was not contacted to review the updated information before adding the revision to the crisis plan.

9. The April 19, 2017, invitation lists April 24, 2017, as the date for the meeting.

10. The Parent was scheduled to participate by phone.

11. The Parent called the administration building, and was unable to reach the Director at the agreed-upon time.

12. The Director stated there was a misunderstanding, that the IEP team was at the Rupert Elementary School (Rupert), and met without the Parent when the Parent did not call.

13. The updated IEP recommends fulltime emotional support (FT/ES) at Rupert.

14. The Parent disapproved the NOREP/PWN, and requested mediation, triggering pendency of the I/LS IEP.

15. Mediation is scheduled for May 31, 2017.

Issue 3:

1. The Parent and the District disagreed over the appropriate placement for the Student.

2. The Director stated that the District and Parent legal counsel discussed an Approved Private School (APS) placement, and the parties agreed the Student would receive homebound services until the APS placement was arranged.

3.

4. The Director stated the Parent did not provide the medical documentation the District requested to initiate homebound services.

5. The Director stated the Parent enrolled the Student in a partial hospitalization program, but did not sign a release for the program to provide information to the District.

6. The Director acknowledged the Student did not attend school from March 23, 2017 to May 5, 2017.

7. As of this writing, the Student is attending Barth.

**DISCUSSION:**

Issue 1:  The District did not update the FBA or the PBSP following the contact to law enforcement on February 8, 2017, or document implementation of the crisis plan and the PBSP for the incidents resulting in suspension.

Issue 2:  The Special Education Teacher documented multiple attempts to include the Parent for each of the IEP team meetings this school year; however, the annual IEP was not completed within timeline, and the revision to the crisis plan with updated contact information should have been revised with the agreement of the Parent.

Issue 3:  The District did not initiate mediation or due process when the District and Parent legal counsel were unable to resolve the disagreement over the appropriate placement, or develop a truancy elimination plan to address the lack of attendance from March 23, 2017 to May 5, 2017.

## CONCLUSIONS:

Issue 1:  The District is not in compliance with the regulations cited above.

Issue 2:  The District is not in compliance with the regulations cited above.

Issue 3:  The District is not in compliance with the regulations cited above.  The Student is eligible for compensatory education to remedy the educational loss.

## CLOSURE/CORRECTIVE ACTION:

Issue 1:  The Superintendent or Designee shall update the FBA and the PBSP on or before July 14, 2017.  As verification of completion, the Superintendent or designee shall submit a copy of the updated FBA and PBSP on or before July 14, 2017.

The Superintendent or Designee shall issue a memorandum to administrative and special education teaching staff emphasizing the importance of being able to document the implementation of the IEP, including following the steps in the crisis plan for this Student, through, for example: incident reports, checklists, and anecdotal records.  An email memorandum with the distribution list of recipients submitted to this Adviser on or before July 14, 2017, is acceptable documentation.

The same memorandum shall remind administrative regular and special education staff of the requirement to update the FBA and PBSP when law enforcement is contacted.  An email memorandum with the distribution list of recipients submitted to this office on or before July 14, 2017, is acceptable documentation.

Issue 2:  The Superintendent or Designee shall issue a memorandum to administrative regular and special education staff reviewing the requirement to conduct the annual IEP within timeline after documenting attempts to include a parent.  The same memorandum shall include a reminder for special education staff responsible for amending the IEP to ensure a parent is in agreement with revising the IEP without a meeting.  An email memorandum with the distribution list of recipients submitted to this office on or before July 14, 2017, is acceptable documentation.

Issue 3:  The Superintendent or designee is directed to convene a meeting on or before July 14, 2017, to develop a plan for compensatory education as a remedy for the student.  The amount of compensatory education services for the six week time period school was in session, in accordance with the school calendar, from March 23, 2017 to May 5, 2017, is as follows:

- 40 minutes per day of SDI not provided multiplied by 27 school days  = 1, 080 minutes or 18 hours owed
- Two days of early dismissal X 30 minutes of SDI not provided in the morning =  60 minutes or one hour owed
- 6 weeks X 30 minutes per week of social skills group not provided = 180 minutes or three hours owed

The total amount of services owed to the Student: 1,320 minutes or 22 hours of specially designed instruction not provided.

EXHIBIT - E

**Mail body: Fwd: Restraint**

---

---------- Forwarded message ---------
From: Shanicqua Aponte <nicqua8212@gmail.com>
Date: Wed, Oct 25, 2017, 9:05 AM
Subject: Re: Restraint
To: Bret Wade <bretwade@cottagesevueducation.com>
Cc: <ejacobs@pottstownk12.org>, Irgang, Lisa <lirgang@pa.gov>


I sat with you extensively before leaving my child in your care,  you had his IEP in hand so if you were opposed to anything in crisis plan you should have voiced your concerns at that time.
Also what you've written this morning o eff not exactly mirror of how you explained events to me yesterday at approx 2:30 when you called.

Shanicqua

On Oct 25, 2017 6:14 AM, "Bret Wade" <bretwade@cottagesevueducation.com> wrote:
Good morning Mrs. Aponte,

I appreciate you reaching out to express your concerns.  I can provide a full report on exactly what transpired but I assure you, I have not and would not ever place a student in a restraint for being disrespectful.  Dayonte was asked to pick his head up, he did not respond so the teacher walked closer noticed he was crying.  She asked is he need help and he let out a loud yell.  He then attempted to rip his notebook and pointed his pencil at our teacher aggressively.  This was completely unprompted and unprovoked based on multiple student and staff witnesses.  He then got up out of his seat and shoved 4 desks across the room before he entered the hall and slammed the door as hard as he could and began walking toward the other program in the school.  He was posed a serious threat to everyone in the building and I had no choice but to place him in a hold for 15 seconds.

In regards to the crisis plan, his behavior had already escalated to the point of physical restraint.  The reason I did not call you was that according to the plan we needed to provide him with "quiet time" and space.  He was deescalated before we reached that point.  There has not yet been adjustments made since and it names district employees specifically in the plan so the current crisis plan is not acceptable going forward.

I would suggest you keep your son home until we can sort this issue out and rewrite the crisis plan to accommodate his current placement.  If an incident like the one that happened yesterday occurs, I am obligated to follow the same practices that we did to handle the first one.

Thank you

Bret O. Wade II, M. Ed
Principal
Cottage Seven Academy
Bretwade@cottagesevueducation.com
267-319-4580
www.cottageseven.com

> On Oct 24, 2017, at 8:38 PM, Shanicqua Aponte <nicqua8212@gmail.com> wrote:
>
> Hello this is Dayontae Hoskins' mother, he started at your school today and restrained. I understand that you feel you needed to because from our conversation this morning that is what you're used to and by doing so the children will be fearful of doing again whatever it was prompting the physical interaction. In Dayontae's crisis plan it specifically says that I am to be called and when I spoke to you approx 2:30pm you informed me of your reasons for not calling. After speaking with Dayontae he says you restrained him for "being disrespectful to teachers " also by your own admission you say it started because he was asked to lift his head up from desk. That was no reason for it to escalate to physical restraint. I have expressed my concerns to the district and not sure of what protocol is following this but this is unacceptable to me.
> His crisis plan is to be followed at all times, it's State regulations.
> I am in no way trying to tell you how to run "your" school but in fairness I expressed to you this morning that it seemed "military " like and if so that this environment would not be good for him. Being restrained every week or whenever he doesn't immediately follow directive or even if told to do something more than once, is unacceptable.
> So I must be honest and tell you that I've filed a complaint with special education compliance department, and this was only after numerous attempts to reach the district today to discuss this matter and they would not return any of my calls.
>
> Thank you

**Mail body: Fwd: Incident reports**

---

---------- Forwarded message ---------
From: **Shanicqua Aponte** <nicqua8212@gmail.com>
Date: Thu, Oct 26, 2017, 1:29 PM
Subject: Re: Incident reports
To: Bret Wade <bretwade@cottagesseveneducation.com>
Cc: Erin Jacobs <ejacobs@pottstownk12.org>


Sir, you kicked my son out of your school and then waited for him to get off van provoked him, called police, he is afraid of you and will not be returning. Just please forward incident reports. I will see you in court!

Shanicqua

On Oct 26, 2017 12:42 PM, "Bret Wade" <bretwade@cottagesseveneducation.com> wrote:
Good Afternoon,

You will have them this afternoon. I am generating the invitation for IEP meeting and IEP waiver forms that will go out at the same time.

Thank you

**Bret O. Wade II, M. Ed**
**Principal**
Cottage Seven Academy
267-319-4580
bretwade@cottagesseveneducation.com
www.cottagesseven.com
https://www.linkedin.com/in/bret-o-wade-ii-18707662/


"The Secret in education lies in respecting the student"
-Ralph Waldo Emerson


920 Morris Street, Pottstown, PA, 19464 (Beech Street Entrance)


On Thu, Oct 26, 2017 at 12:36 PM, Shanicqua Aponte <nicqua8212@gmail.com> wrote:
Mr wade we spoke yesterday and I requested the incident reports 10-24 and 10-25 you said you'd send them I haven't received them. I have received police report. When will you have your version available for me?

Shanicqua

**Mail body: Fwd: Retaliation**

---------- Forwarded message ---------
From: **Shanicqua Aponte** <nicqua8212@gmail.com>
Date: Wed, Oct 25, 2017, 9:36 AM
Subject: Retaliation
To: Pierce, Shannon R. <spierce@foxrothschild.com>
Cc: <cjacobs@pottstownk12.org>, Irgang, Lisa <lirgang@pa.gov>


So because I wouldn't agree to your settlement and advised that I filed complaint about not following crisis plan this principal decides he doesn't want Dayontae there and call police immediately when he steps off van,  there is emergency contact numbers for ppl to pick him up on emergency and none were contacted and then you contact children and youth to have him placed in foster care and now no one from district is answering my calls !.

Shanicqua

EXHIBIT - F

**Mail body: Fwd: Perjury**

---

---------- Forwarded message ---------
From: **Shanicqua Aponte** <nicqua8212@gmail.com>
Date: Thu, Jan 4, 2018, 12:33 AM
Subject: Perjury
To: Ashley Sultzaberger <ashleys@odr-pa.org>
Cc: Pierce, Shannon R. <spierce@foxrothschild.com>, William Culleton <wculleton@odr-pa.org>


At due process hearing January 3, 2018 a witness lied on multiple counts, which I can prove, thus committing perjury.
In other legal proceedings this is considered a crime
I would like to file motion for contempt and have my claims of perjury with accompanying proof documented and submitted for the record.
Please advise if this is to be submitted to officer before next scheduled hearing or to be presented at hearing itself.

Thank you
Shanicqua Aponte

Mail body: Fwd: PROCEDURAL INQUIRY/DH-19970-1718- AS

---

---------- Forwarded message ---------
From: **William Culleton** <wculleton@odr-pa.org>
Date: Thu, Jan 4, 2018, 1:24 PM
Subject: PROCEDURAL INQUIRY/DH-19970-1718- AS
To: Shanicqua Aponte <nicqua8212@gmail.com>
Cc: Pierce, Shannon R. <spierce@foxrothschild.com>

Dear Ms. Aponte:

As you note, the term "perjury" legally is one for the courts, not for an administrative due process hearing. I will not decide whether or not someone has committed "perjury" in the legal sense.

Nevertheless, in administrative due process, I need to determine whether or not to rely upon a witness's testimony. I should hear any evidence that contradicts a witness' testimony, unless that evidence is about an issue that is irrelevant to the issues that I will decide in this matter – or it is otherwise objectionable.

If you wish to offer evidence contradicting a witness's testimony given yesterday, please provide specific notice to Ms. Pierce at least five days prior to the next hearing session, listing the evidence that you propose to present. Please also be prepared to provide that evidence if I decide to hear it at the next session, which will be the last.

"Contempt" is also a term that is used legally in the courts. I do not find people in "contempt" the way the courts do, since I have no power to punish. So there is no need to file a motion for contempt. Just give the proper five day notice to Ms. Pierce, and be ready to offer your evidence at the next session as set forth above.

I hope that this clarifies the procedures for this due process matter.

*William F. Culleton, Esquire, CHO*

Special Education Hearing Officer

P.O. Box 13089

Philadelphia, PA 19101

717 649 4127

For Conference Calls:

Call 1-888-394-8197

Enter Passcode: 177107

This email contains confidential information which may be protected by the Individuals with Disabilities Education Act and/or the Family

EXHIBIT — G



OFFICE FOR DISPUTE
**RESOLUTION**

PENNSYLVANIA
# SPECIAL EDUCATION HEARING OFFICER
WILLIAM F. CULLETON JR., ESQ., P.O. Box 13089  PHILADELPHIA  PA  19101
717-649-4127
wculleton@odr-pa.org

May 11, 2018

Ms. Shanicqua Aponte                                   Pro Se
352 Lincoln Avenue
Pottstown, PA 19464

Pottstown School District                    Shannon R. Pierce Esq.
Administration Building                       Fox Rothschild LLP
Pottstown, PA 19464                           10 Sentry Parkway, Ste. 200
                                              PO Box 3001
                                              Blue Bell, PA 19422-3001

D.H. Due Process Hearing
Nos. 19970-17-18-AS
And 20146-17-18-AS
(Consolidated)

Dear Ms. Aponte and Counsel:

Enclosed is my decision regarding the above.  You may appeal this decision to a court of competent jurisdiction.  Please refer to the enclosed appeals procedures.

For information on procedural safeguards and parental rights, you may contact the Special Education ConsultLine, Office for Dispute Resolution at 1-800-879-2301.

Questions concerning this letter may be directed to the assigned Case Manager at the Office for Dispute Resolution, at 1-800-222-3353.

Very truly yours,

*William F. Culleton, Jr.*

WILLIAM F. CULLETON, JR.
HEARING OFFICER

Enclosures:    Hearing Officer Decision
               Appeals Procedures

**Final Decision and Order**

**HEARING**
**ODR File Numbers (Consolidated):**  19970-17-18-AS and 20146-17-18-AS

**<u>Student's Name</u>:** Dayontae  Hoskins          **<u>Date of Birth</u>:**  04/07/2007

**CLOSED HEARING**

**<u>Dates of Hearing</u>:**
1/3/2018, 1/25/2018, 2/28/2018, 3/14/2018 and 4/20/2018

**<u>Parent</u>:**
Ms. Shanicqua Aponte
352 Lincoln Avenue
Pottstown, PA 19464

*Counsel for Parent*
Pro Se

**<u>Local Education Agency</u>:**
Pottstown School District
Administration Building
Pottstown, PA 19464

*Counsel for the LEA*
Shannon R. Pierce Esq.
Fox Rothschild LLP
10 Sentry Parkway, Ste. 200, PO Box 3001
Blue Bell, PA 19422-3001

**<u>Hearing Officer</u>:**  William Culleton Esq.          **<u>Date of Decision</u>:** 5/11/2018

## INTRODUCTION AND PROCEDURAL HISTORY

The Student named in this matter (Student)[1] is enrolled currently[2] in a middle school provided by the school district (District) named in this matter. The District is the Student's local education agency (LEA) as defined in the Individuals with Disabilities Education Act, 20 U.S.C. §1401 et seq. (IDEA). Student is classified under the IDEA as a child with the disability of Emotional Disturbance.

The Student's parent (Parent) requested due process by filing two complaints, captioned above, on different dates[3]. In her first complaint, Parent asserted that Student's current placement was inappropriate and requested an order to place Student in an approved private school or other private school.[4] In her second complaint, Parent asserted that the District has denied Student a free appropriate public education (FAPE), excluded Parent from educational decision-making, and failed to provide services in the least restrictive environment. The District denies Parent's allegations and seeks dismissal of the complaint.

The hearing was completed in six sessions for both complaints.[5] I have determined the credibility of all witnesses and I have considered and weighed all of the evidence of record.

---

[1] Student, Parent and the respondent District are named in the title page of this decision and/or the order accompanying this decision; personal references to the parties are omitted here in order to guard Student's confidentiality.
[2] By current enrollment, I mean Student's enrollment as of April 30, 2018, the last hearing session in this matter. Parent planned at that time to enroll Student in another LEA.
[3] Parent's first complaint, No. 19970, was filed on November 20, 2017. Her second complaint, No. 20146, was filed on January 16, 2018. Both matters are consolidated for all purposes.
[4] On the last day of hearings, Parent advised that she will withdraw Student from the District shortly and place Student in a cyber-charter school. Parent clearly withdrew her request (set forth in the original complaint) that this hearing officer issue a final order that the District place Student in an approved private school or other private school. Therefore, while I will reach the litigated issues as to the appropriateness of the placements provided and offered by the District, I will not issue an order for specific placement in the future, as this part of Parent's request is withdrawn.
[5] In addition, I issued an order determining the pendent placement, (HO 3), pursuant to which the parties considered various private schools for Student; however, the parties never reached agreement on the placements being considered, and Student has remained in Student's current placement with full-time emotional support.

I conclude, based upon the evidence of record, that the District did not fail to offer and provide a FAPE to Student in the least restrictive environment, that the District did not retaliate against either Parent of Student, and that the District did not impede Parent's participation in educational decision-making. I deny Parent's requests for relief.

### ISSUES[6]

1. Is Student's current placement appropriate?

2. Is Student's current placement the least restrictive appropriate placement for Student?

3. Is placement in a full time emotional support program in an approved private school or other private school an appropriate placement for Student and, if so, would it constitute placement in the least restrictive appropriate environment?

4. From January 16, 2016 to April 30, 2018, has the District provided Student with a FAPE in the least restrictive appropriate environment?

5. From January 16, 2016 to April 30, 2018[7], did the District offer and provide Student with all appropriate supplementary aids and services?

6. From March 11, 2015 to January 16, 2016, did the District offer and provide Student with appropriate supplementary aids and services in the form of a one-to-one paraprofessional or aide?

7. From January 16, 2016 to April 30, 2018, has the District denied Student a FAPE by retaliating[8] against Student or Student's Parent by calling the police on Student or notifying a child protection agency to investigate suggested parental neglect?

---

[6] In her second complaint, Parent asserted three claims regarding District actions or inaction during the period from March 11, 2015 to date, which includes a period more than two years prior to filing (March 11, 2015 to January 16, 2016), which is subject to the statute of limitations. Pursuant to the District's motion to limit claims for the subject period, I dismissed all but one of Parent's claims, including a claim for inappropriate delay of a parent-requested evaluation. (HO 4.) Nevertheless, I found that Parent's claim for the provision of a one-to-one paraprofessional or aide survives the IDEA statute of limitations, ibid, and I list it here as the fourth issue.

[7] I limit the time frame for relief in this matter to the last day of hearings, because I have no evidence of District actions or inaction after that date.

[8] The IDEA and its implementing regulation preclude a hearing officer from deciding any issue not encompassed by the pleadings, unless the opposing party agrees. 34 C.F.R. §300.511(d). Parent has brought her claims only under the IDEA; however, as formulated and agreed by all at the third session of this hearing, the retaliation claim is also brought under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 (section 504), and I decide it under both statutes. (NT 692-694.) There is no question that Student is otherwise qualified within the meaning of section 504 and that the District receives federal funds.

8.  From January 16, 2016 to April 30, 2018, has the District denied Student or Parent a FAPE by impeding Parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to Student?

9.  Should the hearing officer order the District to provide any educational services to Student, including compensatory education services?

## FINDINGS OF FACT

HISTORY

1.  Student's educational history prior to first grade includes Head Start and kindergarten. (S 1.)

2.  Student was identified with a Speech or Language Impairment in first grade in another district. Shortly thereafter, Parent moved and enrolled Student in first grade in a District elementary school. The District exited Student from special education after a District re-evaluation found no need for speech or language therapy. (S 1.)

3.  Student has a history of suffering multiple traumatic events, especially the loss of Student's father and incidents of restraint administered at school and in hospital settings in response to Student's incidents of emotional dyscontrol. (NT 1489-1490, 1592, 1600-1601; P 7.)

4.  Student entered a District elementary school for first grade. Student transferred to another District elementary school from approximately the middle of first grade to April in second grade, and Student experienced significant behavioral difficulties there. Parent was dissatisfied with the staff and services at that location; Parent requested and received a return to Student's original first grade elementary school. (NT 940; P 4; SK 5, 16.)

5.  In first and second grades, Student exhibited significant difficulties with attention to task, impulsiveness and overactive behavior; teachers intervened by providing frequent redirection, breaks and the help of a "peer buddy". Student was noted to walk away from the classroom and from negative situations. Student also exhibited aggressive behavior, both verbal and physical, toward peers and adults. (S 1.)

6.  Student advanced from first through third grades with Student's peers. In first and second grades, Student exhibited good reading decoding skills with below grade level reading comprehension and mathematics skills. Student was performing at an average pace and with passing results in writing, mathematics and other core subjects. (NT 947; S 1, 30, 53.)

CIRCUMSTANCES AND DISTRICT EVALUATION

7. Student has a history of diagnosis with Adjustment Disorder, Unspecified. Prior to third grade and at the beginning of third grade, Student received mental health counseling at school through a contracted provider. (S 1, 37.)

8. The District provided an evaluation report to Parent in September 2015. The report classified Student with Emotional Disturbance and found Student eligible for special education. Test scores revealed significant cognitive weaknesses in processing speed and working memory, impacting Student's listening comprehension, reading fluency and comprehension, written expression and mathematics fluency. (S 1.)

9. The September 2015 evaluation report found a high degree of emotional and behavioral problems with inappropriate behavior, impacting relationships and learning. Behavior inventories revealed significant indicators of depression, attention problems, hyperactivity, organization problems, functional communication problems, aggression and conduct problems, and atypical behavior. (S 1.)

10. The September 2015 evaluation report recommended specially designed instruction for reading fluency, reading comprehension, written expression and mathematics fluency; emotional support; small group and individualized instruction "as much as possible"; continuation of small group intervention for reading and mathematics skills; a functional behavioral assessment (FBA); and an occupational therapy screening. (S 1.)


THIRD GRADE SERVICES

11. Student's classroom staff took data on Student's behaviors in September 2015. (S 37.)

12. The District obtained permission to conduct an FBA and convened an IEP meeting in October 2015. It also began providing special education services in the learning support classroom of Student's then-current elementary school. Student was to receive tier two intervention through the District's regular education response to intervention program. (S 33, 34, 35.)

13. In October 2015, Student was diagnosed with depression and started on anti-depression medication. (NT 698-700, 959-960; S 37.)

14. During the October 2015 IEP team meeting, Parent requested one-to-one support for periods of the school day. The District did not provide such support. (NT 1189-1193; S 37 p. 18.)

15. The District recommended full time emotional support at the District elementary school from which Parent had obtained a transfer due to Student's difficulties and Parent's dissatisfaction with the services. Parent was unwilling to return Student to that school despite the location of full time emotional support services there. (S 37; SK 5.)

16. District personnel at the meeting indicated that medication could be an option for addressing Student's behaviors. Parent interpreted the remarks as an ultimatum requiring

4

either medication or placement outside the District or in the previous school to which Parent objected. District personnel did not consider such remarks to be an ultimatum. (NT 681, 818-826, 984-986, 1049-1052, 1068, 1153-1154, 1189.)

17. The District provided an IEP in October 2015, revised as of December 2015; it placed Student in general education with itinerant learning support; however the team understood the offer to be a supplemental level of support. Student was to be provided small group instruction in the learning support classroom for social and coping skills, but not for reading, mathematics or writing. The IEP provided that Student would meet in small groups to attain IEP goals. (NT 1161-1163, 1181, 1222-1228; S 35, 36, 37.)

18. District personnel advised Parent that the District was recommending full time emotional support. (NT 99-101; S 36, 37 p. 17.)

19. The revised December 2015 IEP included a behavior goal and a positive behavior support plan based upon an FBA. (NT 1244; S 37.)

20. As part of general education differentiation, Student's class sometimes broke into small groups to address individual needs. (NT 1163.)

21. In addition to regular education for reading and language arts, Student received small group reading intervention through the District's regular education response to intervention program. This was small group instruction outside the regular education classroom. (NT 1163-1167.)

22. The December 2015 IEP provided measurable goals addressing reading fluency and accuracy; reading comprehension; written expression; following directions; and utilizing self-regulating and coping strategies. There was no mathematics fluency goal. The IEP included modifications and accommodations addressing attention, organization, listening, reading fluency and comprehension, mathematics fluency, written expression, need for breaks and movement, and emotional and behavioral self-regulation. (S 37.)

23. The December 2015 IEP as revised addressed Student's educational needs. (NT 1217-1230, 1242-1244; S 37.)

24. District teachers implemented the specially designed instruction in the IEP. (NT 1180-1182.)

25. From January to about April of Student's third grade year, the District placed an extra paraprofessional in Student's classroom, not specifically assigned to Student. It was concluded that the extra paraprofessional was not needed and the paraprofessional was reassigned to other duties. (NT 1189-1193, 1230.)

26. The District convened an IEP team meeting in February 2016 to review Student's behavior and progress. Team members, including Parent, were pleased with Student's progress in emotional and behavior control, special education goals and academics. The team continued Student's placement in itinerant learning support sand Parent signed the NOREP for that level of services. (NT 1443-1444; S 37, 44.)

THIRD GRADE PROGRESS

27. After behavioral difficulties in September through November, Student's behavior improved, and it remained improved to the end of third grade. Nevertheless, there was an increase in negative and aggressive behaviors in May 2016. (NT 825, 830, 959-960, 983-985, 1050-1052, 1143-1149, 1186, 1197-1204, 1244-1253, 1256, 1259-1260, 1275-1276, 1436-1440; S 2 p. 10, S 37, S 45, S 55 pp. 11-19.)

28. Student made progress in reading, writing and mathematics in third grade. (NT 1169-1174, 1208-1209, 1224-1225, 1244-1255; S 30, 39, S 60.)

29. Student made significant progress in IEP goals during third grade. (NT 1197-1204, 1442-1444; S 39.)

30. Student received passing grades in mathematics in third grade and was able to access the third grade curriculum. (NT 1174-1177, 1225; S 30.)

31. In third grade, Student performed with proficiency and passing grades in all subjects. Local assessments were supported with accommodations and modifications including reading all questions to Student, breaks and extended time. (NT 1208-1209; S 30, S 37.)

FOURTH GRADE SERVICES

32. In September 2016, District teachers continued providing Student with the services provided in the December 2015 revised IEP. Student received remedial instruction from special education teachers in mathematics and other subjects on an as needed basis. (NT 1256-1257, 1335, 1344-1346, 1373, 1386-1388.)

33. In fourth grade, Student continued to receive counseling services after school from a behavioral health services provider operating within Student's school building. (NT 1229-1230, 1248-1249, 1297-1298; S 10.)

34. In September, Student's doctors changed Student's medication regime more than once. Student was off medication for more than one week. (NT 699-703, 1275-1277; S 2 p. 10; P 3 pp. 17-21.)

35. Student's inappropriate behavior began to escalate in September and October. By the end of October, there had been a significant number of incidents of Student exhibiting refusing, eloping and sometimes dangerous behavior. (NT 1260-1275, 1444-1456; S 2, 10, 50, 55A.)

36. Due to Student's needs, the District assigned a paraprofessional to assist Student in the classroom. The paraprofessional at first assisted Student with reading on two of six days per cycle. This was increased to four of six days by October 2016, and then to daily by November 2016. (NT 1271-1275, 1283-1284, 1360-1361; S 2 p. 7.)

37. The District made multiple efforts to schedule an IEP meeting within one year from the date of the previous IEP, October 14, 2016. Due to work obligations, and Parent's desire to be assisted by an advocate, Parent was unable to participate on the proposed dates as an

IEP meeting. The District chose to keep trying to schedule a date even though the one-year deadline expired. (NT 1257-1259, 1655-1657; S 37, 51.)

38. On or about October 24, 2016, District personnel sent Student to a local hospital due to uncontrolled dangerous behavior. A District educator, a mandated reporter under the law, also called the child protective services agency due to possible abuse as suggested by information known to Student's educators that raised a mere suspicion that Student was not receiving prescribed psychiatric medication on October 24. (NT 703-712, 1260-1275, 1449-1464, 1507-1509, 1527-1537, 1543, 1547-1548; S 2 pp. 10, 17-21, 10, 50, 55A.)

39. Prior to sending Student to the hospital, District personnel made extensive attempts to support Student in de-escalating and calming before calling for emergency response personnel and sending Student to the hospital. Student's principal and the school psychologist intervened directly, trying to calm Student, but were unsuccessful for a period of approximately thirty minutes. During that time, Student engaged in loud, angry, and potentially destructive behavior in various areas of the school building, causing a "lockdown" of other classrooms. The principal notified Parent, who expressed anger about the incident, hospitalization and calling of the child protective agency. (NT 703-712, 1260-1275, 1449-1456; S 2 pp. 17-21, 10, 49, 50, 55A pp. 9-10.)

40. At the hospital on October 24, 2016, Parent disclosed that Student had been off the previous medication and started on new medication. (NT 1458; S 49.)

41. Parent understood that Student was not allowed to return to school because the principal had indicated that Student's crisis plan would need to be changed in connection with Student's return, and no meeting was scheduled at that time. However, Student was not suspended. (NT 1454-1455, 1490-1497.)

42. On October 25 in the morning, Parent came to the school building expressing anger in a loud voice. The principal asked school security personnel in uniform to be present in the area of the outdoor discussion with Parent, and local police came to the area in uniform. Although police were present, they did not intervene and Parent had a discussion with the school psychologist before going to work. (NT 1456-1460, 1490-1497.)

43. Parent attended a meeting on October 26, 2016, at which District personnel planned to offer a revised IEP for Student's following IEP year, October 26, 2017 to October 15, 2017. Parent disagreed that it was an IEP team meeting, because Parent believed that inadequate notice had been given to her. Parent refused to sign the IEP attendance page and the Procedural Safeguards page, but participated in the meeting. (NT 1257-1261, 1318-1319, 1348-1351; S 2 pp. 3, 4, 10, 11; P 2.)

44. At the October 2016 meeting, Parent and District personnel discussed a crisis plan for Student, which needed to be revised in light of the recent increase in serious behavior incidents. (NT 1260-1263, 1265-1267, 1277-1282, 1348-1351, 1466-1467; S 50, 55A.)

45. The group at the meeting also reviewed and made some changes to the goals and modifications from the previous year. (NT 1282-1286; S 2.)

46. Student returned to school on or about the next school day after October 26, 2016. (NT 1478-1480; S 54 p. 7.)

47. From October 2016 through February 2017, Student's behaviors continued to increase in frequency and intensity, with greater and more frequent disruption of the entire school. (NT 1293-1296, 1308-1311, 1344, 1346-1348, 1354, 1360-1362, 1388-1393, 1405-1406, 1477-1478; S 10, 54, 55, 57, 58.)

48. District personnel followed the crisis plan in the IEP in several instances, but in some they failed to call Parent before making other calls, or otherwise failed to follow the sequence of notifications set forth in the crisis plan. (NT 1296-1299, 1464-1474; S 58.)

49. At times, staff called police before reaching Parent because Student was exhibiting behaviors that were dangerous to self or others, because Student was escalating because Student was asked to call Parent, or because Parent could not be reached while at work. Calling non-District emergency responders due to dangerousness was consistent with the crisis plan. (NT 1653-1654; S 59 p. 62.)

50. When using the crisis plan protocol, District personnel became aware of some errors or obsolescence of the contact information in the plan, and, without prior notice to Parent or the convening of an IEP meeting, they changed contact numbers or eliminated persons to be notified in the plan when those persons asked not to be called. The District notified Parent at some time after such changes were made. (NT 1296-1299, 1464-1474, 1568; S 58.)

51. The District attempted to schedule an IEP meeting to change the designation of Student's home school in the IEP, but Parent cancelled the meeting in order to be represented by an attorney. (NT 1291.)

52. In December 2016, there was a settlement meeting with attorneys for both parties and Parent's advocate, with the IEP team available. Parent was unable to attend due to work obligations, but spoke to her representatives by telephone on a lunch break. (NT 1291-1292, 1353, 1474-1476.)

53. On or about February 8, 2017, Student's behavior escalated and became out of control. Student's principal bypassed the steps in the crisis plan and called the police. (P 2.)

54. From February 13, 2017 to about May 8, 2017, Student stopped attending the assigned District elementary school, in part because Parent had enrolled Student in a day treatment program. (NT 1302-1303, 1482-1485, 1608-1609; S 54 p. 8, 55 p. 28; P 3 p. 9, 14, 15.)

55. Parent was unaware and District educators did not advise Parent that the treatment program did not provide a teacher and that it was necessary to provide school work for Student while placed there by the Parent. (NT 1623-1624.)

56. The day treatment program did not notify the District to send school work to Student, and District personnel did not contact the program to make such arrangements, because they

had no release to discuss confidential information with the program. (NT 1303-1304, 1322-1323, 1355-1356, 1364-1365.)

57. During part of this period of time, Parent was believed to be represented and the attorneys for Parent and the District were believed to be attempting to structure a settlement of Parent's grievances, including finding a placement for Student. During all of this period, the parties were attempting to find a mutually agreeable private placement. The parties also discussed home schooling, but this was never effectuated. The District offered homebound instruction as an interim placement, and this was not accepted. The District sent packets to private schools when it received a release from Parent to do so. At all times during this period of time, the District was willing and offered to provide any placement being considered by either party. (NT 1477, 1544-1545, 1556-1605, 1619-1621; S 6, 31 p. 8, S 31, 59.)

58. On or about April 17, 2017, Parent filed a complaint with the Bureau of Special Education alleging that the District had failed to comply with the Student's crisis plan; that the District had revised Student's IEP without ensuring Parent's participation; and that the District failed to provide a FAPE to Student while Student was participating in the day treatment program. (P 2.)

59. The Bureau found a failure to update Student's FBA and positive behavior support plan, and ordered the District to conduct an FBA and update Student's positive behavior support plan. (P 2.)

60. The Bureau found that the District had revised the crisis plan without the Parent's agreement. It ordered the District to notify staff of the requirement that a parent agree to changes in the IEP made without an IEP team meeting. (P 2.)

61. The Bureau found that the October 2016 IEP was issued out of time and ordered corrective notices to staff. (P 2.)

62. The Bureau found that the District had failed to file for due process on the parties' disagreement regarding appropriate placement. It found that the District had failed to pursue truancy when Student was absent during a period from March 23, 2017 to May 5, 2017 and ordered the District to provide Student with 22 hours of compensatory education services. (NT 1671; P 2.)

63. The District performed all ordered corrective actions. (P 7.)

64. On or about April 24, 2017, The District convened an IEP team meeting pursuant to an invitation to Parent. Because Parent was to participate by telephone, the director of special education felt that it would be acceptable to move the location of the meeting. Due to a series of errors, Parent calling in for the meeting was not able to participate. (NT 1605-1608, 1634-1636; S 31 pp. 23-24.)

65. At the team meeting in the absence of Parent, District educators decided to offer Student full time emotional support, with additional services in the form of a one-to-one

paraprofessional in the classroom. This offer was conveyed to Parent in a letter dated May 2, 2017. (NT 1608-1609; S 31 pp. 23-26.)

66. Parent rejected the District's May 2, 2017 offer because Student was to be placed in the elementary school from which Student had been removed by the superintendent's action in March or April 2015, due to traumatic events and Parent's concerns at that time. (S 8.)

67. Student returned to Student's previously assigned elementary school on or about May 8, 2017. Student was assigned to different teachers and was given a reduced work load with much of Student's school time spent on breaks, in view of Student's previous behavior in response to work demands and frustration. (NT 1357-1358, 1398, 1485-1486.)

68. Parent sought to have Student retained for the next school year, but District administrators recommended against retention because research shows that it is rarely if ever appropriate for any child. (NT 1612-1613.)

69. As of May 2017, Student's placement in regular education with supplemental learning support was not meeting all of Student's educational needs that stemmed from Student's emotional dysregulation and consequent behavior. Student needed full time emotional support at that time due to these concerns. (NT 257-258, 1310-1312, 1354-1355, 1357, 1363-1364, 1393-1394, 1396-1398, 1401-1403, 1405-1406, 1414-1418.)


FOURTH GRADE PROGRESS

70. Student made minimal progress on IEP goals during fourth grade, except in reading comprehension and behavior, in which Student regressed. Student attained passing but lower grades than Student had attained in third grade. (NT 1306-1307, 1336-1337, 1356-1357, 1383-1386, 1400-1401, 1618; S 10, 37, 53, 60.)

71. Student's fourth grade academic performance, behavior and social needs did not warrant retention. (NT 1358-1359.)


FIFTH GRADE SERVICES

72. Student graduated to the District's middle school for fifth grade. (S 10.)

73. Student's IEP team met in July 2017 and added a revised positive behavior support plan to Student's IEP, and altered goals and modifications to address behavioral concerns. Modifications included added testing accommodations and elimination of timed reading and mathematics assessments for class based assessments. (S 10.)

74. The July 2017 IEP changed Student's placement to full time emotional support for all academics and IEP goals, with general education instruction for specials, school-wide activities and field trips. (S 10.)

75. Parent did not agree to the full time emotional support placement. (S 10, 11.)

76. Student's last agreed-upon placement remained itinerant learning support. (NT 167-168, 1290-1292, 1615; S 2, 37 p. 34, S 8, S 13, S 44.)

77. In August 2017, Parent signed a permission for an FBA. (S 12.)

78. On September 2017, Student stood on a railing in a staircase over 20 feet above the floor of the staircase. Student was restrained and emergency personnel were called. (NT 149-150; S 20.)

79. On September 27, 2017, Student engaged in behavior that threatened staff and peers. Student picked up a pair of scissors and gestured threateningly toward staff. (NT 134, 150-152-156, 251-256, 265-274, 280-282; S 20, 28.)

80. During the incident, trained staff were required to block Student's dangerous behaviors in order to maintain the safety of others prior to following the steps specified in Student's IEP crisis plan. (NT 272-273.)

81. Student was suspended for ten days and a manifestation determination meeting was scheduled prior to transferring Student to a specified 45 day disciplinary setting, which was a program operated by a contracted agency in a District facility. (NT 134-137, 139-140; S 13.)

82. The District convened a manifestation meeting on October 6, 2017, and it determined that the Student's behavior was a manifestation of Student's disability of emotional disturbance. It also determined that the incident was not due to a failure to follow the IEP, with Parent dissenting from this finding. It also found that Student's wielding of scissors constituted possession of a weapon, authorizing placement in a 45 day alternate setting notwithstanding the manifestation determination. (NT 140-141; S 13.)

83. Instead of placing Student in the 45 day placement right away, the District agreed with Parent to seek an alternate private placement jointly that would be acceptable to both parties. (NT 1687-1689, 1736-1737; S 13.)

84. Meanwhile, a behavior specialist was conducting an FBA. (S 13.)

85. On October 20, 2017, the District's behavior analyst provided an FBA, positive behavior support plan and crisis plan for Student. The FBA provided useful information to address Student's most concerning behaviors. (NT 1700-1703; S 14.)

86. On October 23, 2017, the District changed Student's placement to the 45 day interim alternate educational placement, and Student began attending that placement on October 24, 2017. (NT 1737; S 15, 20, 31 pp. 44-45.)

87. The alternate setting provided a higher degree of behavioral support and smaller classes; District leaders anticipated that this setting would provide a better opportunity for Student

to access the curriculum and make better progress in view of Student's emotional disorder and history of disruptive behavior. (NT 1687-1689.)

88. On October 24, 2017, Student exhibited dangerous and threatening behavior during a melt-down at the 45 day placement. Restraint was applied and Student eventually deescalated; however, Parent was not called immediately because the placement's principal judged that to do so would interfere with Student's de-escalation, because Student was worried about Student's mother finding out about Student's behavior. (S 20.)

89. On October 25, 2017, Student exhibited behavior believed to be dangerous to self and others, including throwing rocks at a car and was taken to and held at a police station for several hours. Nevertheless, District personnel conveyed to Parent that Student was allowed to return to school the next day if the crisis plan could be revised. Parent kept Student out of school for several days and eventually Student returned to school at the alternate placement. (NT 1689-1696, 1744-1745; S 31 pp. 44-45.)

90. The program principal at the 45 day placement did not follow the Student's crisis plan during the incident on October 25, and indicated to Parent that he had no intention of doing so. However, by October 26, 2017, both the District supervisor of education and the District director of special education directed the principal to comply with the crisis plan and the supervisor assured Parent on October 25 that Student could return to school the next day. (NT 206-208, 1689-1696; S 31 pp. 44-45.)

91. At an IEP team meeting on November 2, 2017, the previous restraints were discussed, and the District offered an annual IEP for Student. It offered completion of the 45 day alternative educational placement with full time emotional support until December 19, 2017, then return to Student's neighborhood middle school with supplemental emotional support and a positive behavior support plan. The IEP offered ESY services with full-time emotional support. It offered goals or modifications to address attention and time on task; emotional regulation and behavior; cognitive fluency weaknesses; reading fluency and comprehension; written expression; mathematics; social skills; and functional communication. (NT 1700; S 18, 25.)

92. On November 10, 2017, Parent rejected the proposed IEP and requested due process. Parent contested the plan to return Student to the middle school, among other things. (S 19, 21.)

93. On November 30, 2017, Student again became out of control behaviorally and restraint was applied. The District proposed IEP meeting dates to review the incident, including a meeting within ten days. (S 20, 22, 23.)

94. On December 5, 2017, the District sought parental permission to re-evaluate Student. (S 24.)

95. By the end of the 45 day placement, Student's behavior had improved and Student appeared to be accessing the curriculum. (NT 1705-1706; S 20, 27, 28.)

96. In December 2017, the District offered an IEP with full-time emotional support to facilitate the process of finding private placements as agreed-to by both parties. The IEP offered one-to-one paraprofessional support for the first time, as well as full time emotional support, de-escalation strategies and ESY. (NT 1703-1704, 1710; S 18, 25; HO 3.)

97. In December 2017, Parent rejected a NOREP for ESY services and requested due process. (S 26.)

98. Student returned to the middle school from the alternate placement in December 2017, placed in full-time emotional support. (NT 1708-1710; P 7 p. 9.)

99. There was another incident of restraint in February 2018, but Student was present in school for more days in fifth grade than in fourth grade. (NT 1708-1710; S 20, 27, 28.)

100.    In March 2018, the District issued a NOREP offering placement in a specific private school pursuant to the hearing officer's interim pendency order and the District's belief that the parties had agreed on the specific placement. Parent did not sign the NOREP and Student was not placed at the specified approved private school. (NT 1710-1711; S 61 pp. 78-81; HO 3.)

101.    In April 2018, Parent indicated an intention to enroll Student in a cyber charter school. (NT 1711-1712.)

102.    During Student's fifth grade year, the District offered a variety of placements that it believed would address Student's educational needs for smaller class size and specialized, structured services addressing Student's emotional, social and behavioral needs. (NT 1683-1684, 1689, 1699, 1705-1708, 1712-1719.)

103.    Without additional supplemental aids and services, the District's middle school cannot meet all of Student's educational needs that stem from Student's emotional dysregulation and consequent behavior, due to its large size, high number of students, and the likelihood that interactions with peers will trigger emotional dysregulation. (NT 67-68, 74-82, 257-261; P 7.)

104.    Student can be expected to benefit from placement in an approved private school or other private school that offers small, highly structured classroom environments and specialized behavior intervention programs. (NT 1705-1708, 1712-1719.)

105.    If attending classes in a public school setting in the future, Student would need placement in full time emotional support with an individualized behavior management program based upon a thorough FBA that includes data gathering and assessment, and supplemental aids and services. (NT 67-68, 74-82, 257-261; P 7.)

## DISCUSSION AND  CONCLUSIONS OF LAW

BURDEN OF PROOF

The burden of proof is composed of two considerations, the burden of going forward and the burden of persuasion.  Of these, the more essential consideration is the burden of persuasion, which determines which of two contending parties must bear the risk of failing to convince the finder of fact.[9]  In Schaffer v. Weast, 546 U.S. 49, 126 S. Ct. 528, 163 L.Ed.2d 387 (2005), the United States Supreme Court held that the burden of persuasion is on the party that requests relief in an IDEA case.  Thus, the moving party must produce a preponderance of evidence[10] that the moving party is entitled to the relief requested in the Complaint Notice.  L.E. v. Ramsey Board of Education, 435 F.3d 384, 392 (3d Cir. 2006).

This rule can decide the issue when neither side produces a preponderance of evidence – when the evidence on each side has equal weight, which the Supreme Court in Schaffer called "equipoise".  On the other hand, whenever the evidence is preponderant (i.e., there is weightier evidence) in favor of one party, that party will prevail, regardless of who has the burden of persuasion.  See Schaffer, above.

In the present matter, based upon the above rules, the burden of persuasion rests upon the Parent, who initiated the due process proceeding.  If the Parent fails to produce a preponderance of the evidence in support of Parent's claims, or if the evidence is in "equipoise", the Parent cannot prevail under the IDEA.

---

[9] The other consideration, the burden of going forward, simply determines which party must present its evidence first, a matter that is within the discretion of the tribunal or finder of fact (which in this matter is the hearing officer).

[10] A "preponderance" of evidence is a quantity or weight of evidence that is greater than the quantity or weight of evidence produced by the opposing party.  See, Comm. v. Williams, 532 Pa. 265, 284-286 (1992).  Weight is based upon the persuasiveness of the evidence, not simply quantity.  Comm. v. Walsh, 2013 Pa. Commw. Unpub. LEXIS 164.

CREDIBILITY/RELIABILITY

It is the responsibility of the hearing officer to determine the credibility and reliability of witnesses' testimony. 22 Pa. Code §14.162 (requiring findings of fact); A.S. v. Office for Dispute Resolution, 88 A.3d 256, 266 (Pa. Commw. 2014)(it is within the province of the hearing officer to make credibility determinations and weigh the evidence in order to make the required findings of fact). I carefully listened to all of the testimony in light of the documentary evidence, and I reach the following determinations.

Both parties challenged the credibility of various witnesses, both directly and by implication. Carefully considering each witness in view of these challenges, I found no evidence to impugn the credibility or sincerity of Parent or any District witnesses.

I found corroboration of some of Parent's assertions in the documentary evidence and in the testimony of others, although there were numerous testimonial contradictions of her statements, especially statements that District officials were excluding Student from school in fourth grade. I conclude that some apparent contradictions and changes of heart in negotiations over placement are best explained as misinterpretations of circumstances and a lack of trust in Parent's District negotiating partners. Thus, while I weigh the evidence in these instances in favor of the District, according less weight to Parent's interpretations of the events in question, I do not intend to impugn Parent's honesty or sincerity in doing so.

Similarly, I found all District witnesses to be credible, based upon the substantial consistency of their testimony with the documentary and testimonial record, their demeanor under oath, and their ways of responding to various questions.

DEFINITION OF FAPE UNDER THE IDEA

The IDEA requires that a state receiving federal education funding provide a "free appropriate public education" (FAPE) to disabled students. 20 U.S.C. §1412(a)(1), 20 U.S.C. §1401(9).  FAPE is "special education and related services", at public expense, that meet state standards, provide an appropriate education, and are delivered in accordance with an IEP. 20 U.S.C. §1401(9).  Thus, local education agencies must provide a FAPE by designing and administering a program of individualized instruction that is set forth in an IEP. 20 U.S.C. §1414(d). As discussed above, the IEP must be tailored to meet the "unique" needs of each eligible Student.

In addition, the IEP must be "reasonably calculated" to enable the Student to receive appropriate services in light of the Student's individual circumstances. Endrew F., 137 S. Ct. above at 999. The Court of Appeals for the Third Circuit has ruled that special education and related services are appropriate when they are reasonably calculated to provide a Student with "meaningful educational benefits" in light of the Student's "intellectual potential." Shore Reg'l High Sch. Bd. of Ed. v. P.S. 381 F.3d 194, 198 (3d Cir. 2004) (quoting Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171, 182-85 (3d Cir. 1988)); Mary Courtney T. v. School District of Philadelphia, 575 F.3d 235, 240 (3d Cir. 2009), see Souderton Area School Dist. v. J.H., Slip. Op. No. 09-1759, 2009 WL 3683786 (3d Cir. 2009). In appropriate circumstances, an LEA that meets this Third Circuit standard also can satisfy the Endrew F. "appropriate in light of the student's individual circumstances" standard. E.D. v. Colonial Sch. Dist., No. 09-4837, 2017 U.S. Dist. LEXIS 50173 (E.D. Pa. Mar. 31, 2017).

For a student not progressing smoothly from grade to grade an LEA must offer and provide educational services that are "appropriately ambitious" in light of the Student's circumstances.

Endrew F., 137 S. Ct. above at 1000. The student must have a chance to meet "challenging objectives." Ibid.

An LEA is not necessarily required to provide the best possible program to a student, or to maximize the student's potential. Endrew F., 137 S. Ct. above at 999 (requiring what is reasonable, not what is ideal); Ridley Sch. Dist. v. MR, 680 F.3d 260, 269 (3d Cir. 2012). An IEP is not required to incorporate every program that a parent desires for her or his child. Ibid.

The law requires only that the program and its execution were reasonably calculated to provide appropriate benefit. Endrew F., 137 S. Ct. above at 999; Carlisle Area School v. Scott P., 62 F.3d 520 (3d Cir. 1995), cert. den. 517 U.S. 1135, 116 S. Ct. 1419, 134 L.Ed.2d 544 (1996)(appropriateness is to be judged prospectively, so that lack of progress does not in and of itself render an IEP inappropriate.)  The program's appropriateness must be determined as of the time at which it was made, and the reasonableness of the program should be judged only on the basis of the evidence known to the LEA at the time at which the offer was made.  D.S. v. Bayonne Board of Education, 602 F.3d 553, 564-65 (3d Cir. 2010); D.C. v. Mount Olive Twp. Bd. Of Educ., 2014 U.S. Dist. LEXIS 45788 (D.N.J. 2014).

Applying these standards to the above findings and the record as a whole, I conclude that the District offered to provide a FAPE to Student at all times. Prospectively, I conclude that the District has offered multiple placements that meet the legal requirement to offer a FAPE. Although Parent has criticized the District for restraining Student inappropriately, failing to prompt Student in a sufficiently gentle way, and failing to include Parent in educational decision-making, I conclude that the evidence does not support a finding of denial of FAPE. Parent's criticisms do not negate the plethora of services that the District offered to Student over the relevant period, which

constitute a FAPE. Thus, I conclude that the preponderance of the evidence does not prove a substantive denial of a FAPE, and that no order for services would be appropriate in this matter.


APPROPRIATENESS OF CURRENT OFFER OF SPECIAL EDUCATION SERVICES

I conclude that the current District offer of special education services is appropriate. As the discussion of grades three through five below will show, the District has convincing evidence that Student is not reasonably likely to succeed in an itinerant or supplemental level of services; rather, Student needs the small class sizes, structured program and specialized behavioral interventions that can be provided by a full-time emotional support program.

Moreover, such program is not likely to permit Student to make meaningful, appropriate progress currently or in sixth grade at the large setting of the District's middle school without substantial modifications to Student's program. There is preponderant evidence that the large setting provides numerous, uncontrollable opportunities for interpersonal contact and conflict that can trigger behavioral melt-downs and emotional dyscontrol. Thus, as it stands, the middle school environment provides too many opportunities for further trauma to Student due to emotional dyscontrol and escalated behaviors.

This conclusion does not necessarily preclude placement in the middle school. The District's and the state's obligation to instruct children in the least restrictive environment mandates that the District offer supplemental aids and services to overcome any known barrier to instruction with non-disabled peers. This hearing officer cannot mandate otherwise. Rather, the District must explore thoroughly the concern that the middle school environment risks triggering melt-downs and escalation. There may be ways to shield Student from those triggering environmental and social factors. There may be ways to instruct Student – especially as Student

matures from year to year – in emotional self-regulation, so as to empower Student to overcome environmental triggers and remain available for instruction. Thus, I conclude that full time emotional support in the middle school would be inappropriate without appropriate supplemental aids and services that are reasonably likely to render the middle school environment supportive of Student's emotional healing, growth and educational progress.

LEAST RESTRICTIVE ENVIRONMENT

The IDEA requires states to ensure that children with disabilities will be educated with children who are not disabled, "to the maximum extent appropriate … ." 20 U.S.C. §1412(a)(5)(A). Separate schooling, or other removal of children with disabilities from the regular education environment is permissible only if education in regular classes "cannot be achieved satisfactorily" through the use of supplementary aids and services. 34 C.F.R. §300.114(a)(2)(ii). Removal is not permitted if the sole reason is "needed modifications in the general education curriculum." 34 C.F.R. §300.116(e). The United States Supreme Court has interpreted this mandate to require districts to educate children with disabilities with non-disabled students "whenever possible." Bd. of Educ. v. Rowley, 458 U.S. 176, 102 S. Ct. 3034, 3049, 73 L.Ed.2d 690 (1982).

The United States Court of Appeals for the Third Circuit has construed the statutory language to set forth a "strong Congressional preference" for integrating children with disabilities in regular classrooms. Oberti v. Board of Ed. Of Bor. Of Clementon Sch. Dist., 995 F.2d 1204, 1213-1214 (3d Cir. 1993). The Court characterized this preference as creating a "presumption" in favor of educating children with disabilities in the general education environment, id. at 1214, at least for "a significant portion" of the school day. Id. at 1215 n.21.

The Commonwealth of Pennsylvania has adopted and further articulated the IDEA requirements in its regulations implementing the IDEA. 22 Pa. Code §14.145. In addition to incorporating the language of the statute, the regulation adds the requirement that a district may not remove a child from the regular education classroom, or determine a child to be ineligible for such placement, solely because of the nature and severity of the child's disability, or because of considerations of cost or administrative convenience. 22 Pa. Code §14.145(4).

The Court in Oberti emphasized that the central consideration in determining whether or not a district has provided a FAPE in the least restrictive environment is the "proper use of supplementary aids and services." Oberti, 995 F.2d above at 1214. The Court pointed out that each district must make available the "continuum of alternative placements", including special classes and special schools, 34 C.F.R. §300.115(a). Districts must also provide "supplementary services … in conjunction with regular class placement." 34 C.F.R. §300.115(b)(2); Oberti v. Board of Ed. Of Bor. Of Clementon Sch. Dist., 995 F.2d above at 1216.

The Court in Oberti set forth a two part analysis for determining whether or not a local educational agency has complied with the least restrictive environment requirement.  First, the court (or in this case the hearing officer) must determine whether or not the child can be educated satisfactorily in the regular education setting with supplementary aids and services.  Second, the court must determine whether or not the agency has provided education in the general education setting to the extent feasible, such as inclusion in part of the general education classes and extracurricular and other school activities.  Oberti, 995 F.2d above at 1215.

The present matter turns on the first level of the Oberti analysis. Can Student be educated in the regular education classroom with supplementary aids and services? If so, the District is compelled by law to provide the aids and services that are needed to educate Student in the least

restrictive environment. Only if Student cannot reasonably be expected to receive a free appropriate public education in the regular education setting is the District authorized to place Student elsewhere.

The Court set out three considerations that must be examined in order to make a determination of whether or not Student can be educated in the regular classroom:  First, has the agency given "serious consideration" to utilizing the full continuum of placements and supplementary aids and services?  Id. at 1216.  Second, what are the comparative educational benefits that the child can receive in the regular education and segregated settings, particularly considering the benefits of learning social and communication skills in the general education context.  Ibid.  Third, is the child's behavior in the regular education setting so disruptive that the child is not benefitting and that the behavior is interfering with the education of the other children in the general education setting?  Id. at 1217.  The Court emphasized that if supplementary aids and services would prevent these negative consequences, the determination of a negative effect on peers would not warrant removal from the regular education environment.  Ibid.

I conclude that the District's current offer of special education services complies with its obligation to provide instruction in the least restrictive environment. The District has specified that Student needs full-time emotional support in small classroom settings with structured behavior intervention programs delivered by staff specially trained in behavior intervention techniques. As discussed below, the record proves that the District is correct. Student cannot be educated satisfactorily in the general education environment. Moreover, the District's offer provides for instruction with general education peers as much as is practicable. Thus, the District has offered appropriate services in the least restrictive environment, in compliance with the IDEA.

At the first level of the <u>Oberti</u> analysis, the record is preponderant that Student cannot be educated in the general education classroom, even with supplementary aids and services. Having placed Student in general education for all academics in third grade, the District attempted to maintain Student in general education for fourth grade, employing a range of supplementary aids and services. The results were unsatisfactory from the beginning to the end of fourth grade. Even when the District increased the supports in fourth grade, Student was unable to maintain emotional or behavioral control, leading to multiple episodes that traumatized Student, disrupted Student's access to instruction, disrupted the education of others, and produced only minimal educational progress in the entire year. I conclude that the evidence in this matter demonstrates that the three tests at the first Oberti level of analysis are met: the District has given "serious consideration" to the provision of supplementary aids and services; Student has received minimal educational benefit in regular education, yet did demonstrably better in the small atmosphere of more restrictive placements; and Student's presence in the general education classroom disrupted the education of others to an unacceptable extent.

At the second level of the Oberti analysis, I conclude that the District's offered services do support instruction with non-disabled peers to the maximum extent appropriate. The District has offered to instruct Student in full-time emotional support, and in general education for specials and arts as appropriate. I conclude that this is an appropriate offer that is consistent with the District's obligations to provide instruction in the least restrictive environment.


PLACEMENT IN AN APPROVED PRIVATE OR OTHER PRIVATE SCHOOL

As discussed above, Student needs full time emotional support, and the record shows preponderantly that Student makes greater progress in that setting than in less restrictive settings.

Although a private school that provides a specialized program of behavioral intervention would thus satisfy the <u>Oberti</u> first level test, it would offer less instruction with non-disabled peers than would the middle school full time emotional support classroom. The question is whether or not the private school setting satisfies the second level <u>Oberti</u> test: has the District offered and provided education in the general education setting to the extent feasible, such as inclusion in part of the general education classes and extracurricular and other school activities? I conclude that a private school meeting the criteria offered by the District for Student would meet that second test if the IEP team seriously considers any and all supplemental aids and services that could make the middle school environment appropriate.

The record in this matter demonstrates that the middle school presents some potentially fatal obstacles to Student's ability to access the curriculum. Witness testimony credibly supports the conclusion that the large environment with numerous peers is likely to trigger emotional dyscontrol that could escalate to Student's injury and educational detriment.

The Student's IEP team, based upon this record, could conclude appropriately that the better course for Student would be to place Student in a private setting until Student gains the skills needed to withstand and even thrive within the larger middle school environment. It could only do so after a thorough consideration of any and all possible supplemental aids and services that might make the middle school environment a satisfactory location for Student's full time emotional support program. I conclude that, should the IEP team so conclude after serious consideration of supplemental aids and services, the second level <u>Oberti</u> standard would not render a private school placement inappropriate.

PROCEDURAL VIOLATIONS

A hearing officer's decision must be based upon a "substantive" denial of FAPE. 34 C.F.R. §300.513(a)(1). Procedural violations can amount to a denial of FAPE only if they: 1) impeded the Student's right to a FAPE; 2) impeded the parent's right to participate in decision making; or 3) caused a deprivation of educational benefit. 34 C.F.R. §300.513(a)(2).

The record discloses some procedural deficiencies, some of which were procedural violations of the IDEA and its implementing regulations. The District failed to review Student's IEP within one year of the previous IEP. The District failed to seek a hearing officer ruling or apply truancy procedures when Student was out of school for a lengthy period of time in fourth grade. Among the many instances in which Student was restrained from destructive or dangerous behavior, District educators sometimes failed to follow Student's crisis plan to the letter, by failing to follow the exact sequence of responses specified in the plan. Moreover, the plan was changed without an IEP meeting or parental participation in fourth grade. Of the many IEP team meetings called in this case, the location was changed in one instance without notice to Parent, and through a string of subsequent errors, Parent was excluded from the meeting. While the evidence establishes that these things happened, they did not rise to the level of a substantive denial of FAPE, either alone or in combination.[11]

---

[11] The IDEA permits a hearing officer to address procedural violations without ordering compensatory education. 34 C.F.R. §300.513(a)(3). I have considered doing so here, as some evidence suggests that there may have been repeated and concerning violations in the last three school years. I have not issued a formal order for three reasons: first, the director of special education is in her first year, (NT 122), so she was not responsible for allowing repeated procedural violations, and there is no reason to think that she is not committed to procedural compliance going forward; second, the evidence is not clear as to many of the alleged violations, and I have not adjudicated each and every allegation because Parent failed to prove that any violations caused a denial of FAPE, and she requested only relief in the form of compensatory education; third, I trust that it is sufficient for this hearing officer to observe that a thorough review of District compliance with IDEA procedures may be in order.

LATE ANNUAL IEP TEAM MEETING

Student's fourth grade annual IEP review meeting was convened ten days late, on October 26, 2016. This was a procedural violation. 34 C.F.R. §300.324(b)(1)(i). The late IEP meeting was due to the parties' inability to find an agreed date despite numerous attempts. Although the supports in that IEP were starting to appear inadequate for Student, as Student's behavior was escalating in September and October of fourth grade, I find no evidence that the ten day delay in addressing this escalation contributed to a denial of FAPE.

There is no evidence that the delay caused a deprivation of FAPE to Student, 34 C.F.R. §300.513(a)(2)(iii), or impeded Parent's right to participate in educational planning, 34 C.F.R. §300.513(a)(2) (ii). During this delay, Student continued to receive special education under the October 16, 2015 IEP, as revised, including behavioral health counseling, and added paraprofessional services, which were increased during the period of delay. Thus, the District was responding to the change in behavior during the delay period, and there is no evidence to suggest that reviewing the IEP on time would have caused a more successful intervention or prevented subsequent episodes. The delay itself did not prevent Parent from participating, because the District made multiple attempts to schedule the meeting consistent with Parent's schedule. Indeed, the record shows that the reason for the delay was that the District's director of special education wanted to make every effort to include Parent in the meeting, even at the expense of a procedural violation. While this was an incorrect choice under the law, it demonstrates that any lack of Parent's participation was not due to the delay. Thus, I find no denial of FAPE due to this procedural violation.

FAILURE TO SEEK PLACEMENT ORDERS FOR UNEXCUSED ABSENCES

The District failed to seek due process or truancy when Student was absent from February 13, 2017 to May 8, 2017. While this constituted a denial of a FAPE to Student during part of the fourth grade year, that deprivation has been remedied fully by the Bureau of Special Education.

With regard to the remainder of time that Student was out of school during fourth and fifth grades, some of that time was due to unexplained and unexcused absences, apparently during a period of extreme financial stress for Student and Parent, prior to Student's admission to the therapeutic program in March.

The record shows by a preponderance that the District's personnel made multiple attempts to contact Parent, invite Parent to meetings, and obtain Student's re-admission to the District's elementary school. The record shows that Parent was either unresponsive to such overtures or refused them for various reasons. Based upon this evidence, I cannot conclude that the District failed to comply with the IDEA, nor that it was responsible for the fact that Student did not receive an education.

Parent's effort to show that the District had in fact forbidden Student's return to school must fail based on the persuasive evidence provided by the District to the contrary. Similarly, Parent's effort to show that the District's calling of the police deterred her from re-engaging with the District to get Student back into school must fail, because the evidence does not show by a preponderance that the District called the police inappropriately or with an intent to discourage Parent from returning Student to school.

FAILURE TO FOLLOW CRISIS PLAN

Parent has shown by a preponderance that, at least on a few occasions, District staff did not call Parent in the exact sequence of steps specified in Student's crisis plan, thus failing to follow it. The District showed that, in some cases, staff were unable to reach Parent at the time of the crisis. In other instances, Student's behavior and presentation convinced them that calling Parent would further escalate Student's sometimes violent or aggressive behavior. Admittedly, Student's principal more than once judged a crisis to be so dangerous to Student and others that he called police right away with the intent to have Student taken immediately to a hospital or into police custody for Student's protection and that of others.

The record shows that the plan allowed exceptions for situations where the behavior was dangerous to Student or to others; thus, it is unclear from the record that these deviations from the plan were procedural violations, since all potentially or actually involved dangerous behavior. Yet even if they were violations, the Parent has failed to show by a preponderance of the evidence that the violations impeded or deprived Student of a FAPE or interfered with Parent's participation in Student's education plan.

On the contrary, all of the instances were in the context of an emergency in which Student was not able to access the curriculum, directly and solely due to Student's disability for extended periods of time, and in which Parent's participation was not in educational planning, but was in a medical emergency at school. Conceivably, these failures to follow the plan might have caused the episodes to deprive Student of access to the curriculum for longer periods of time, or to be more injurious because of greater intensity. Yet, Parent did not introduce evidence to support such possibilities. There was no opinion evidence establishing a link between the failure to follow the plan exactly and any impediment to either Student's access to the curriculum or Parent's

participation in Student's educational planning. Therefore, Parent has failed to prove a deprivation of FAPE because of these failures to follow the crisis plan.

## CHANGING THE CRISIS PLAN UNILATERALLY

District witnesses admitted frankly that they had changed the crisis plan without consulting with Parent. There is no doubt that this was a procedural violation of the IDEA, which requires parental participation in any changes to the IEP, of which the crisis plan was a part. 34 C.F.R. §300.324(b)(1)(IEP team must review annually and revise as appropriate); 34 C.F.R. §300.321(a)(1)(IEP team must include parents). Yet the nature of the changes convinces this hearing officer that this procedural violation was not a deprivation of FAPE.

Parent should have been consulted about these changes before they were made, but there is no evidence that the changes caused a deprivation of FAPE. The changes were simply to the contact list that is part of the plan, not to the order of steps in the plan, such as de-escalation attempts and whom to call when de-escalation fails. The individuals on the list told school officials to change the telephone numbers for calling them. Some indicated that they no longer wanted to be called. One agency contact was no longer providing services to Student and therefore was taken off the list. The changes did not cause the crisis plan to become ineffective; if anything, they caused it to become more effective. Parent has failed to prove by a preponderance that these changes deprived Student of FAPE. 34 C.F.R. §300.513(a)(2)(iii).

The changes did deprive Parent of the opportunity to participate in the fine-tuning of the plan as changes became necessary. But the IDEA regulation does not define as a denial of FAPE any and all such deprivations. FAPE is denied only if a procedural violation "significantly impeded" a parent's participation in educational decision-making. 34 C.F.R. §300.513(a)(2)(ii).

Parent has failed to prove by a preponderance that she was deprived of participation "significantly." Indeed, she was notified of the changes, albeit belatedly, in early February. The changes had been made occasionally over the two month period in which the crisis plan had been in use. I conclude that this belated notice did not deprive Parent of the opportunity to participate in educational planning "significantly". Therefore Parent has not shown a deprivation of FAPE due to this procedural violation.

EXCLUSION FROM IEP TEAM MEETING

In April 2017, the District invited Parent to an IEP team meeting to review Student's IEP. Parent responded that she could participate only by telephone. Numbers were arranged, and when Parent called to the District's administration building, she was not put through to the meeting, because the District's director of special education had moved the location of the meeting to another building. Meanwhile, the IEP team had attempted to reach Parent by telephone and was unable to do so. The team proceeded without Parent and later sent proposed IEP changes to Parent by mail. Parent has failed to show that this was a procedural violation by a preponderance of the evidence. The record shows that it was a mistake and miscommunication, and Parent's cross examination of the director failed to elicit evidence to show that the mistake was negligent or inappropriate in any way.

FAPE IN THIRD GRADE

As determined in my ruling on the application of the statute of limitations, I must determine whether or not the District offered and provided a FAPE to Student from January 16, 2016 to the last hearing session on April 30, 2018. (HO 4.) This encompasses roughly the second half of

Student's third grade year. As noted above, I must first consider what the District knew about Student's educational needs prior to that time, and then consider whether or not the District addressed those needs appropriately as defined by the cases discussed above. This must be based entirely upon the record before me.

By January 2016, the District was aware that Student needed significant special education intervention for serious emotional disorder, disruptive behaviors, prominent difficulties with attention to task in the classroom and academic difficulties with reading comprehension and mathematics fluency. Its evaluation report emphasized the need for small instructional settings. Student also had been started on medication for Student's emotional needs.

The District also was aware of Student's response to its interventions during the first half of the school year. These interventions included an FBA-based positive behavior intervention program, an IEP addressing all of Student's educational needs, and small group instruction in the learning support classroom for explicit instruction in social and coping skills, as well as small group instruction in the general education tier II response to intervention and instruction program for reading. Further support was provided for mathematics and writing. By the time of the IEP team review in February 2016, shortly after the start of the relevant period for purposes of this decision, all parties were pleased to note that Student was making progress in behavior and academic performance. Thus, the evidence before the District was that its interventions were appropriate, and it maintained those interventions to the end of the year. Student's progress continued through the end of the year. I conclude that here was no deprivation of FAPE during this time period.

Parent argues that the District failed to provide a FAPE because it failed to provide Student with a one-to-one paraprofessional in the classroom. My ruling on the statute of limitations

requires me to consider whether such deprivation was a denial of FAPE from March 11, 2015 to the end of third grade. I see no evidence that this failure to accede to Parent's wishes for a one-to-one paraprofessional deprived Student of a FAPE during this period of time, for two reasons. First, the District did provide extra paraprofessional support to Student's classroom, in order to support Student; the paraprofessional was not assigned exclusively to Student, but provided support to Student as the record shows before being discontinued as unnecessary. Second, as discussed above, Student made progress during this period of time; Student's progress was satisfactory to all parties, and on this record it was both meaningful and appropriate to Student in view of Student's circumstances. Therefore, I conclude that the failure to provide a one-to-one paraprofessional to Student alone did not deprive Student of a FAPE.

Parent expressed great concern about remarks made at an IEP team meeting in October 2015 suggesting that medication would make it possible for Student to remain in a less restrictive setting in the elementary school to which the District superintendent had reassigned Student at Parent's request. Parent considered the suggestion as an "ultimatum" that forced her to medicate Student; District personnel uniformly denied any "ultimatum" or pressure to provide medication. I find that a preponderance of the evidence does not support Parent's interpretation of the remarks. Nevertheless, the October 2015 IEP meeting is not within the relevant period for this matter and therefore, I reach no conclusion about this issue.


FAPE IN FOURTH GRADE

At the beginning of fourth grade, Student's educators reasonably believed that Student would be supported sufficiently with the then-current IEP and would be able to make meaningful

and appropriate progress in the curriculum. However, Student's medication regime changed[12], and this coincided with a marked deterioration in Student's behavior. Student's behavioral problems began to interfere with Student's learning and that of others substantially.

The record is preponderant that the District responded within a reasonable time to the Student's escalating behavior problems. In September and October, it increased the level of paraprofessional support in the classroom, and it made reasonable efforts to schedule an IEP team meeting before the expiration of Student's annual IEP. Although the meeting ultimately was convened late, as discussed above, nevertheless, it was held[13] in late October 2016, and District educators at the meeting offered to revise Student's crisis plan and modify the IEP to address Student's current needs. Unfortunately, these changes were insufficient to stem Student's worsening behaviors.

The situation was exacerbated in October, when Student's principal had Student hospitalized during an episode of uncontrollable dangerous behavior, and reported Parent to the state child protection agency. Parent subsequently vented her anger on the telephone and in person to the principal. The principal called the police in response, souring the trust between Parent and principal, and eventually leading to withdrawal of Student from school in February, without excuse, for approximately three months, until May 2017. During most of that time, Parent placed Student in a therapeutic day program that provided Student with no education.

---

[12] The testimony shows that, within a month to six weeks, it seemed to Student's team and principal that Student's medication changes might be due to parental negligence. Although the record does not raise a reason to doubt the sincerity of these concerns, neither does it support an inference of parental negligence in this regard. There is evidence that Student's doctors disagreed over the selection of medications. In short, this record does not support any conclusion about the reason for the medication changes in fourth grade.

[13] There was contradictory and non-preponderant evidence as to the notice that Parent received for this meeting. Parent arrived for the meeting objecting that she had not been notified that it was to be an IEP team meeting. Nevertheless, the meeting went forward. I find that the meeting, notwithstanding its label, reviewed the IEP as required by law, and served this essential function of an IEP meeting.

In May 2017, Student returned to the District, in the same elementary school from which Student had been removed in February. Student was assigned to different classroom and teachers. Student was given less demanding work deliberately, with inordinately frequent breaks. These modifications were for the purpose of preventing recurrence of the melt-downs that had prevented Student from learning and had disrupted the entire school through February.

From February to May 2017, the District and Parent negotiated about a change in placement that the District had recommended consistently since Student's behaviors deteriorated in the beginning of fourth grade. Parent and two successive attorneys conducted these negotiations, and there were several changes in Parent's demands as to placement. In response to Parent's multiple suggestions, the District expressed a willingness to provide placement in multiple approved or other private schools, its own emotional support classroom at the elementary school level, temporary homebound instruction, and home schooling (which the District's special education department could not provide, but which it did not oppose).[14] Eventually, there was no change in placement, and the District received Student back in the school from which Student had departed, despite its consistent position that Student should be in a more structured, smaller educational environment.

Obviously, Student did not receive meaningful educational benefit during much of Student's fourth grade year. The question is whether or not the District failed to offer or provide services appropriately designed to provide such benefit. I conclude that the District did not fail to offer appropriate services. Clearly, it did not provide such services, but I conclude that this was because Student was not in school. I analyze this school year in four periods of time: first, the

---

[14] Parent brought up the idea of retaining Student in elementary school for another year, and this is the only request or suggestion that the District opposed, on the record before me. District educators based their opposition on research that concludes that retention is almost never beneficial to a child under any circumstances. As retention is not within my jurisdiction, I offer no conclusion about the appropriateness of the District's position on this parental request.

period from the first day of school to October 26, 2016, when the IEP team reviewed and revised Student's annual IEP; second, from October 26, 2016 to late February, when Parent withdrew Student from school; third, from late February until May 8, when Student returned to the previous elementary school; and fourth, from May 8 to the end of the school year.

FIRST PERIOD FROM FIRST DAY OF SCHOOL TO OCTOBER 26, 2016

During this period of time, Student's behavior was deteriorating. The District had recommended to Parent previously that Student needed a more structured, smaller environment with specialized behavior intervention strategies and knowledge. Yet it had also receded from that position when Student appeared to be succeeding in third grade in the less restrictive setting of itinerant or supplemental learning support. The District also knew that Parent firmly opposed a return to the elementary school that housed the District's full time emotional support classroom, due to the unfortunate and traumatic experiences that Student and Parent had experienced there.

Under these circumstances, the District's educators immediately enhanced the paraprofessional support in Student's then-current classroom. This was its response to the change in Student's behavior and the realization that its current interventions suddenly and unexpectedly were no longer effective. The record supports the conclusion that this was a reasonable response. Indeed, Parent had been asking for increased paraprofessional support, albeit on a one-to-one basis that the District had refused. Given that the District responded early on with an added service reasonably calculated to address the need, the District is accorded a reasonable period of time to determine whether or not the intervention was effective. I conclude that the District's services were appropriate based upon what it knew at the time during this first period of fourth grade.

SECOND PERIOD FROM OCTOBER 26, 2016 TO LATE FEBRUARY 2017

Unfortunately, the District's interventions were not sufficient to stem Student's behavioral and emotional deterioration. This deterioration culminated in Student's hospitalization on October 24, 2016, when the District was unable to bring Student's dangerous behavior and emotional distress under control. Two days later, the IEP team reviewed Student's IEP and revised its crisis plan, goals and modifications to meet the recently manifested needs. Although their intervention at this segment of the school year proved to be inadequate, Parent has not shown by a preponderance of the evidence that it was inappropriate as of the time it was offered. As discussed above, under the law, the intervention had to be reasonably calculated to provide an opportunity for meaningful, appropriate progress in light of Student's disability, based upon what the District knew at the time. Parent has failed to prove that the offered services did not meet this standard. Therefore, I conclude that there was no denial of FAPE in the second segment of fourth grade, based upon the record before me.

Parent seems to suggest that the elementary school principal's handling of Student's hospitalization in October 2016 somehow negated the efficacy of the District's services to Student, perhaps by re-traumatizing Student. While I do not reject the notion that Student was traumatized by the incident, I do not find preponderant evidence that this so exacerbated Student's emotional distress and behavior that it was the cause of Student's deterioration in fourth grade. Nor do I conclude that this facial evidence of trauma to the child constitutes preponderant evidence that the District failed to provide a FAPE.

Similarly, I have considered whether or not the District's occasional failures to follow Student's crisis plan exacerbated Student's decline during this segment of fourth grade. I find no evidence to support such a notion.

THIRD PERIOD: LATE FEBRUARY 2017 TO MAY 8, 2017

Once Parent withdrew Student from school, the District was prevented from providing services. Nevertheless, it engaged in extensive and varied efforts to find common ground with Parent during this period of fourth grade. The evidence is preponderant that it made Student's previous elementary school available, and was willing to place Student in a variety of more specialized emotional support settings. It also offered homebound services in the interim. Parent negotiated on the subject of placement, but never decided to accept any of the offered placements. Thus, the District was prevented from providing appropriate services during this period of fourth grade.

Parent seems to argue that the District was at fault for the fact that Student did not receive educational services while participating in the therapeutic day program in which Parent unilaterally placed Student from March 2017 to May 8, 2017. I conclude that Parent has failed to prove fault on the part of the District, or any unwillingness to provide services to Student during that time. Parent did not advise the District that Student was in that program. The evidence shows that Parent did not sign releases to enable the District to communicate with that program for purposes of providing educational services. There is evidence to suggest that Student's IEP team was aware that such services could be provided at the therapeutic program, through "sending work" to the program for Student, and had done so in the past for other children. Thus, there is not preponderant evidence that the District failed[15] or refused to provide services to Student during this segment of fourth grade.

---

[15] By this conclusion, I do not mean to contradict the finding of the Bureau of Special education, (P 2), that Student was denied FAPE due to the procedural failure to seek due process or proceed with truancy in these circumstances. As discussed above, the Bureau has remedied the denial of FAPE that it found due to this procedural violation.

FOURTH PERIOD: MAY 8 2017 TO END OF SCHOOL YEAR

During this time, the District provided Student with reduced work demands in order to avoid triggering further frustration and behavioral melt-downs. Under the circumstances, this was not shown to be inappropriate. By this time, it was clear, and I so find, that the District's elementary school learning support program was not capable of meeting Student's needs, regardless of what services the District attempted to provide by way of supplemental aids and supports. The District had exhausted all avenues to find an agreed alternate placement. Yet it was constrained to accept Student to its learning support program in order to get Student back to school. The evidence does not show preponderantly that its services during this period of fourth grade were inappropriate.

FAPE IN FIFTH GRADE

In view of Student's experiences in fourth grade, and Student's upcoming graduation to middle school, the District convened an IEP team meeting in July 2017, prior to the start of Student's fifth grade year. It offered placement in full time emotional support at the middle school. It reviewed and revised the Student's positive behavior support plan and revised Student's goals and modifications to address Student's disability and behaviors. In particular, it modified testing times to reduce the likelihood that frustration due to slow processing speed would trigger behavioral incidents. Student entered the middle school in fifth grade without these revised services, because Parent did not sign the NOREP consenting to their implementation.

Student began exhibiting dangerous behavior at the end of September. In short order, Student stood on a railing more than 20 feet above the ground, and had a melt-down during which Student threatened to use scissors as a weapon against staff trying to calm Student and block Student's dangerous behaviors. On October 6, 2017, the District convened a manifestation

determination meeting in view of its decision to suspend Student for ten days and transfer Student to a full-time emotional support, specialized facility as an interim educational placement for 45 days due to the Student's use of a weapon in school. The District, with Parent's agreement, determined that the use of the scissors was a manifestation of Student's disability and determined to transfer Student to the 45 day placement, which Parent opposed. District educators then agreed to work with Parent to locate a private placement that would provide appropriate services. These efforts proved fruitless, and on October 23, 2017, the District placed Student at the 45 day placement.

On October 24, 2017, Student behaved in a dangerous manner; on October 25, 2017, Student again exhibited dangerous behavior and was taken into police custody.[16] The Supervisor of special education made it clear on that day that Student was not suspended and could return immediately to the 45 day placement. Parent held Student out for a few days, and then returned Student to the placement.

The District invited Parent to an IEP team meeting to perform an annual review of Student's IEP, which was due to be performed on the next day. Parent was unable to attend and the meeting was held more than a year after the one year review mark, on November 2, 2017. At the meeting, the District offered full time emotional support after completion of the 45 day placement, revisions to the IEP to provide further support for Student's emotional disability and behaviors, and ESY services with full-time emotional support for the ESY program. In November, the District provided a re-evaluation of Student. In December, the District offered to place Student in full time emotional support at an approved private placement agreeable to Parent.

---

[16] Parent asserted that the District called the child protective agency again because of this incident, but there is no evidence that this call was made by District personnel, and the District denies calling the child protective agency. Thus, there is not preponderant evidence of retaliation or other impropriety with regard to the call to the agency.

In December 2017, the 45 day period expired and Student was returned to the middle school emotional support program with increased supports. In February 2018, there was another incident of restraint. In March, 2018, the District revised the IEP to make it possible to apply to private placements being explored by the parties, and provided a re-evaluation report. In April, Parent announced her intent to place Student in a cyber charter school.

For most of fifth grade, Student was in District placements, with the exception of the 45 day placement, which was operated by a contracted agency. Parent presented little evidence to show that these placements were inappropriate. Weighing all of the evidence regarding fifth grade, I conclude that the District did not fail to offer or provide a FAPE to Student.

Parent's evidence as to fifth grade consisted of various transactions in which Parent asserted that the District either exacerbated Student's condition, impacting Student's education, or denied her the opportunity to participate in Student's educational decision-making. These included using physical restraint and calling police and the child protection agency; the 45 day placement failing to follow the steps set forth in the crisis plan that was part of the IEP; the 45 day placement's failure to utilize a "soft" approach to redirecting Student when upset; and giving notice of an IEP team meeting scheduled for the next day. As discussed above, these are alleged procedural violations, and similar to my conclusions about such violations above, I conclude that the alleged violations did not constitute a denial of a FAPE.

Parent has proven a concerning refusal by the principal of the 45 day placement to comply with Student's IEP crisis plan by the program that operated the 45 day placement. However, District personnel corrected the principal and Student was allowed to return to school the next day. Thus, this refusal, which was not by a District representative, did not result in a denial of FAPE. Although Parent held Student out of the placement for several days despite the assurances of the

District supervisor, the preponderance of the evidence indicates that Student did better at the 45 day placement, as Student continued there, finished the program, and continued in the middle school with less lost time due to disciplinary incidents than in the prior year.

Parent failed to prove by a preponderance of the evidence that the use of restraint during fifth grade by either the 45 day placement or the District was inappropriate The evidence is more than preponderant that the educators at the 45 day program were authorized to use restraint in the situations of which there is evidence, and that they used it appropriately.

Parent raised concerns about whether or not the 45 day program used "soft" redirection as called for in the IEP. However, Parent failed to provide preponderant evidence that this failure occurred. On the contrary, the supervisor of special education testified credibly that he conveyed Student's IEP to the principal of the 45 day program, and the director of special education testified credibly that she instructed the principal to follow the IEP in full. Thus the evidence is not preponderant that there was a violation regarding "soft" redirection.

As to the incidents where the police were called, again, there is no evidence to show that inappropriate decisions were made. Thus, there is not preponderant evidence of a violation or denial of FAPE.

Viewing the evidence as a whole, I conclude that the incidents recounted by Parent did not deprive her significantly of the opportunity to participate in educational decision-making. 34 C.F.R. §300.513(a)(2)(ii). While the late notice of an IEP meeting – set for the next day – is concerning, and the second late annual IEP review suggests a pattern in this case, neither proves a significant impeding of Parent's access to educational decision-making.

INTERIM ALTERNATE PLACEMENT IN FIFTH GRADE

Parent challenges the District's decision to place Student in the interim alternate educational setting, known as "Cottage 7". Parent contends that scissors are not a weapon by definition. Parent also contends that, because Student found the scissors in the classroom, they could not be considered to be a weapon. Parent also suggests that the District, by issuing an extension of the suspension to ten days, evidenced doubt that the scissors were a weapon at first, suggesting that the belated determination that they were a weapon was a pretext to force Student into the 45 day placement. The IDEA compels a rejection of these claims.

The IDEA regulation authorizes a district to place a child with a disability in a 45 day alternate placement regardless of the manifestation determination if the child "[c]arries a weapon to or possesses a weapon at school ... ." 34 C.F.R. §300.530(g)(1)("Special circumstances"). The regulation defines the term "weapon" as used in this subsection as a "dangerous weapon" as defined in a specified section of the United States Code. That section defines "dangerous weapon as follows:

> The term "dangerous weapon" means a weapon, device, instrument, material, or substance, animate or inanimate, that is used for, or is readily capable of, causing death or serious bodily injury, except that such term does not include a pocket knife with a blade of less than 2 1/2 inches in length.

18 U.S.C. § 930 (4/11/18).

The definitions above include a broad range of things, including anything that "is readily capable of ... causing death or serious bodily injury ... ." Ibid. I conclude that this broad range of things includes scissors, which can be used to inflict physical harm.[17] Under the above section of the IDEA, it does not matter if the weapon was found in the classroom. Student took it without

---

[17] The only exception in the statutory definition is for a pocket knife of a certain size; the scissors in question were not a pocket knife on this record.

authority and wielded it as a weapon. Clearly, Student in these circumstances "possess[ed] a weapon" in school as the IDEA requires. Thus, the District was authorized to place Student in the 45 day alternate placement based upon possession of a weapon.

The District's delay in deciding to proceed for the 45 day alternate placement raises circumstantial inference of pretext, but does not prove it. There can be many explanations for the delay of two or three days. The District introduced credible evidence that the delay was for the purpose of gathering evidence and Parent did not contradict this evidence. Thus Parent has not proven pretext by a preponderance of the evidence.

I have considered whether or not the District's attempt to reach agreement with Parent on a more permanent placement delayed the 45 day placement so long as to somehow invalidate it. I reject this concern. Nothing in the IDEA regulation or the federal definition of dangerous weapon places a time limit on changing a child's placement due to possession of a dangerous weapon.

While the delay might suggest that the District's educators did not truly consider the Student to have been dangerous on September 27, 2017, the delay alone is not preponderant evidence of such a belief. Nothing else in the record supports such a surmise. I cannot so conclude on this record.

Rather, I conclude that there is no legal reason to question the District's attempt to find common ground with Parent about placement. When the attempt failed, the District effectuated the change in placement to Cottage 7; nothing in the IDEA precludes it from delaying that change in placement in order to seek an agreed placement.

LEAST RESTRICTIVE ENVIRONMENT – THIRD, FOURTH AND FIFTH GRADES

As discussed above, the District made efforts in all years to provide Student with instruction in the general education setting to the extent practicable. Oberti v. Board of Ed. Of Bor. Of Clementon Sch. Dist., 995 F.2d above at 1216. In third grade, Student was able to learn in the general education setting with itinerant support, goals and modifications. But in fourth grade, it became apparent from the beginning that more support would be necessary. The District immediately intervened and recognized that Student would need at least supplemental learning support, and before long, it recognized that Student would need full time emotional support. Such placement was not forthcoming due to the parties' inability to reach agreement on a setting for Student's education, and Student did not make appropriate progress. By fifth grade, Student was placed in a full-time setting, and did better within a few weeks, after an initial burst of emotional and behavioral dyscontrol. The record is preponderant that this child needs a more restrictive setting as discussed above. It also proves that the District offered such services at all times. Therefore, the District has fulfilled its least restrictive alternative obligation to Student.


PROVISION OF ONE-TO-ONE PARAPROFESSIONAL – THIRD, FOURTH AND FIFTH GRADES

The above conclusion that the District provided services in the least restrictive environment also requires the conclusion that the District provided appropriate supplementary aids and services, including consideration of a one-to-one paraprofessional for Student – throughout the relevant period of time. As discussed above, I find that Student did well with itinerant learning support in third grade. When that level of support became insufficient in fourth grade, the District increased supports appropriately, including placing a paraprofessional in the classroom for gradually

increasing amounts of time. That the paraprofessional was not assigned exclusively to Student is immaterial. A district is not bound to provide all services desired by loving parents. Ridley Sch. Dist. v. M.R., 680 F.3d 269 (3d Cir. 2012). It has the discretion under the IDEA to make judgments as to the type of appropriate services it will deliver. K.C. v. Nazareth Area Sch. Dist., 806 F. Supp. 2d 806, 813-814 (E.D. Pa. 2011). Therefore, I conclude that the District offered the appropriate level of supplementary aids and services, including paraprofessional support in the classroom, during the relevant period.

PROVISION OF ONE-TO-ONE PARAPROFESSIONAL – SECOND AND THIRD GRADES

In my ruling on the statute of limitations, I found that Parent's claims about provision of a one-to-one paraprofessional from March 11, 2015 to January 16, 2016 must be decided. I conclude that the District's refusal to provide such a services during this period of time did not deprive Student of a FAPE. As discussed above, Student was progressing appropriately at that time. The District at one point assigned a paraprofessional to the classroom in case Student should need such support, and the services were found to be unnecessary. Therefore, I conclude that the District did not fail to offer and provide Student with appropriate supplementary aids and services in the form of a one-to-one paraprofessional or aide during the second half of Student's third grade year.

RETALIATION

Parent brings her claims under the IDEA. It is unclear whether or not the IDEA provides for a claim of retaliation. Sch. Dist. of Phila. v. Post, 262 F. Supp. 3d 178, 199 n. 2 (E.D. Pa. 2017). I address the claim as a matter of fact, and conclude that the facts do not support Parent's claim of retaliation under the IDEA or section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §704.

Under the analogous statutes, the Americans With Disabilities Act, 42 U.S.C. § 12101 (5/7/18) and section 504, Parent must show "(1) that [she] engaged in a protected activity, (2) that [the District's] retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." Lauren W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007); Derrick F. v. Red Lion Area Sch. Dist. 586 F. Supp. 2d 282, 299 (M.D. Pa. 2008). Under both statutes, Parent can establish the required causal connection by proving either "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing." Id. I conclude that Parent has not proven any of these elements.

Parent alleges that the District retaliated against her and Student by calling police on multiple occasions and notifying the child protection agency. There is no evidence that District personnel did these things in response to Parent's advocacy for her child. Rather, the evidence proves by a preponderance that police were called when Student's behavior was so uncontrollable that Student posed a danger to self or others. Police were not called in every instance of such dyscontrol, as the record also shows preponderantly. Parent had been advocating vigorously for her child for years. Thus, there is no "unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action," Moreover, there is no evidence that would support a finding that District personnel harbored hostility or intent to threaten Parent. There is no evidence that District actions were calculated to inhibit Parent's participation in educational decisions; indeed, the District routinely invited Parent to meetings and invited Parent to communicate with them about even the incidents in which police and child protective agencies were called. Thus, Parent has failed to prove by a preponderance of the evidence before me that

45

there was a "pattern of antagonism coupled with timing." I conclude that Parent has failed to show that the District's responses to Student and Parent constituted retaliation in violation of the IDEA.

IMPEDING PARENTAL PARTICIPATION

As discussed in detail at several places above, the Parent has proved some procedural violations that could have impeded Parent's participation in Student's educational decision-making. However, Parent has failed to prove any instances in which such violations did in fact impede Parent's participation. Therefore, I conclude that there is no denial of a FAPE due to procedural violations that impeded Parent's participation.

## **CONCLUSION**

I conclude that the District's current offers of educational services are appropriate and that the offered services could be provided appropriately in an approved private or other private school if there is prior serious consideration of placement in middle school with supplementary aids and services. I conclude that the current offers would satisfy the District's obligation to provide instruction in the least restrictive alternative, even if provided in a private school setting. I conclude that the District offered a FAPE to Student in the least restrictive setting, with appropriate supplementary aids and services, during all of the relevant period, and that it provided such appropriate services whenever permitted by Parent. I conclude that the District did not retaliate against either Parent or Student, or impede Parent's participation in educational planning to a significant extent. Consequently, I order no relief.

## ORDER

In accordance with the following findings of fact and conclusions of law, the requests for relief are hereby **DENIED** and **DISMISSED**.

It is **FURTHER ORDERED** that any claims that are encompassed in this captioned matter and not specifically addressed by this decision and order are denied and dismissed.

*William F. Culleton, Jr. Esq.*

_____
WILLIAM F. CULLETON, JR., ESQ.
HEARING OFFICER

DATED: May 11, 2018

EXHIBIT - H

From: Shanicqua Suber [nicqua8212@yahoo.com]
Sent: Thursday, April 16, 2015 7:04 AM
To: Pam Bateson; Ron Williams; Katina Bearden; Mary-Beth Bacallao; Kimberly Stilwell; Andrew Kefer; Jeff Sparagana; Judyth Zahora
Subject: Re: Meeting scheduled for 4/16

It is not fair to my son or myself that you have no consideration that I work and go to school and am unable to meet on such short notice. We met on April 7,2015 and you were supposed to send email with time and date of meetings days ago,you never did. You were also suppose to cc Mrs Meade to this email about meeting, you didn't do that. I wrote you months ago and requested that my son be tested for IEP, he had one when entering this school district and it was immediately taken away. I have previously scheduled events today that prevents me from making meeting that I was just informed of less than 24 hours ago. Again I requested that my son be tested months ago and that still hasn't happened, this is by far the worst school district that I have ever encountered . You're main concern is not the children but in your own words "you've been audited concerning IEP S ," this whole thing is a farce ! This school district has failed my son on so many levels because you and your colleagues are too arrogant to admit when you've made a mistake and as a result my son has suffered tremendously by not receiving a proper education.


Sent from Yahoo Mail on Android

---

From:"Pam Bateson" <pbateson@pottstownsd.org>
Date:Wed, Apr 15, 2015 at 3:13 PM
Subject:Meeting scheduled for 4/16

Mrs. Aponte, I left voicemail for you a little earlier this afternoon.  This is just to confirm that we are meeting tomorrow at 2:30.  Rather than holding this meeting at Rupert, at your request we have changed the location and will plan to meet with you at the Administration Building.  Thank you ~ Pam

Pamela Bateson
Director of Special Education & Student Services
Pottstown School District
610-970-6688
Fax: 610-323-9307

There can be no keener revelation of a society's soul than the way in which it treats its children.  Nelson Mandela

Confidentiality Notice: This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.



## Appointment
1 message

**Kizmect Meade** <kmeade@mhasp.org>                                    Mon, Nov 14, 2016 at 8:20 AM
To: Shanicqua Aponte <nicqua8212@gmail.com>
Cc: Kimberly Stilwell <kstilwel@pottstownsd.org>

That's not policy, but you could certainly speak with the school board members. I don't understand how he can not speak with you, but you still have recourse.
Kizmect Meade

On Mon, Nov 14, 2016 at 8:14 AM, Shanicqua Aponte <nicqua8212@gmail.com> wrote:

Good morning, I just called District office spoke to Nash to schedule appointment with superintendent to discuss my issues on the schools concerning two of my children and I was advised that he refused to meet with me. Why is that? And is that policy and procedures refusing to speak to parents?

Mrs Aponte


--
Kizmect Meade
Family Mentor MHASP
Family Advocate
(267)507-3487 (office)
(267)559-9218 (cell)
(215)525-2882 (fax)
kmeade@mhasp.org (email)





## Appointment
1 message

**Kimberly Stilwell** <KStilwel@pottstownsd.org>                    Mon, Nov 14, 2016 at 10:21 PM
To: Shanicqua Aponte <nicqua8212@gmail.com>
Cc: Kizmect Meade <kmeade@mhasp.org>

Hi Nicki - I checked with Mr. Rodreguise on this issue. I was told Mrs. Nash gave him your request for an appointment first chance she had. He requested her to contact you (this was before noon) to set up an appointment I believe on Thursday. (With what works best for your schedule) I hope you received this message today. But if you didn't please call the admin in the morning. Please know he most likely will have to reschedule other appointments to make this work.
It would be wonderful if Kismect could join you when you meet with him. Having her advocacy skills and knowledge, might make a difference for your child. She is so dedicated to the needs of the kids in this district and is perceived this way by many.
Ps sorry I am just getting to my emails, I just got done trying to return everyone's calls today, but it is just to late to try and finish that now. So I moved on to email, I figure your emails are about what you called me about. I have another long day of work tomorrow so if you need to talk leave me a message and I can call you on Wednesday.(day off I think)
Kim

Sent from my iPad

On Nov 14, 2016, at 8:11 AM, Shanicqua Aponte <nicqua8212@gmail.com> wrote:

> Good morning, I just called District office spoke to Nash to schedule appointment with superintendent to discuss my issues on the schools concerning two of my children and I was advised that he refused to meet with me. Why is that?  And is that policy and procedures refusing to speak to parents?
>
> Mrs Aponte

3



## Appointment
1 message

**Shanicqua Aponte** <nicqua8212@gmail.com>                    Mon, Nov 14, 2016 at 8:14 AM
To: Kimberly Stilwell <kstilwel@pottstownsd.org>
Cc: Kizmect Meade <kmeade@mhasp.org>

Good morning, I just called District office spoke to Nash to schedule appointment with superintendent to discuss my
issues on the schools concerning two of my children and I was advised that he refused to meet with me. Why is that?
And is that policy and procedures refusing to speak to parents?

Mrs Aponte