# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHANICQUA APONTE,<br>                    Plaintiff, | | CIVIL ACTION |
| v. | | |
| POTTSTOWN SCHOOL DISTRICT,<br>                    Defendant. | | NO.  18-3199 |

## MEMORANDUM OPINION

This case concerns a years-long dispute between *pro se* Plaintiff Shanicqua Aponte and the Pottstown School District ("Defendant" or "the District") regarding the education of her minor, special-needs child, D.H.  In early 2018, Plaintiff initiated a due process hearing with Pennsylvania's Office for Dispute Resolution ("ODR"), alleging that the District had failed to meet its obligations under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400, *et seq.* ("IDEA"), and had retaliated against her in violation of Section 504 of the Rehabilitation Act of 1973, 19 U.S.C. § 794(a) ("Section 504").[1]  The Hearing Officer denied Plaintiff's requests for relief.  Plaintiff is appealing the Hearing Officer's decision through her Second Amended Complaint.  Defendant has moved for judgment on the administrative record or, in the alternative, summary judgment.  For the reasons set forth below, the Court finds by a preponderance of the evidence that the Hearing Officer's decision was correct and, thus, will grant Defendant's motion for judgment on the administrative record.

---

[1] The Supreme Court has recognized that parents have independent rights under the IDEA.  *See Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 529 (2007).

## I. BACKGROUND

### A. Statutory Framework

To contextualize the facts of this case, an overview of the statutory framework is necessary.

#### i. IDEA

"Under the IDEA, a state receiving federal educational funding must provide children within that state a 'free appropriate public education' (FAPE)." *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 65 (3d Cir. 2010). "The right to a FAPE ensures that students with special education needs receive the type of education that will 'prepare them for further education, employment, and independent living.'" *Ferren C. v. Sch. Dist. of Philadelphia*, 612 F.3d 712, 717 (3d Cir. 2010) (quoting 20 U.S.C. § 1400(d)(1)(A)). "A school district provides a FAPE by designing and implementing an individualized instructional program set forth in an Individualized Education Plan (IEP), which must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 729-30 (3d Cir. 2009) (internal quotations omitted). Special needs children should be educated in the "least restrictive environment"—"one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled . . . ." *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 535 (3d Cir. 1995).

The IDEA also provides procedural safeguards to parents and students should disputes arise. Its provisions afford parents of a disabled child the opportunity to present a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child. . . ." 20 U.S.C.

§ 1415(b)(6)(A).  States must adopt procedures affording "[a]n opportunity for any party to present a complaint" with respect to those matters.  20 U.S.C. §§ 1415(a), (b)(6)(A).  Once they file, parents "shall have an opportunity for an impartial due process hearing . . . ."  20 U.S.C. § 1415(f)(1)(A).  In Pennsylvania, the ODR is responsible for conducting IDEA due process hearings.  *See* 22 Pa. Code § 14.162.  An aggrieved parent may appeal the hearing officer's decision by bringing a civil action in federal court.  *See* 20 U.S.C. § 1415(i)(2)(A).

### ii.  *Section 504*

Section 504 of the Rehabilitation Act of 1973 works "in parallel" with the IDEA and prohibits discrimination on the basis of disability by programs that receive federal funds.[2]  *P.P.*, 585 F.3d at 730.  While IDEA "sets forth a positive right to a [FAPE,]" Section 504 "is cast in negative terms, barring all federally funded entities (governmental or otherwise) from discriminating on the basis of disability."  *Jeremy H. by Hunter v. Mount Lebanon Sch. Dist.*, 95 F.3d 272, 278 (3d Cir. 1996).  The anti-retaliation regulation implementing Section 504 states:

> No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purposes of interfering with any right or privilege secured by [the Act], or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing . . . .

34 C.F.R. § 100.7(e).

To prove a retaliation claim under Section 504, a plaintiff "must show (1) that they

---

[2] Section 504 states, in relevant part:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a).

engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." *Lauren W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). "A defendant may defeat the claim of retaliation by showing that it would have taken the same action even if the plaintiff had not engaged in the protected activity." *Id.* at 267.

### B. Facts

With this structure in mind, the Court turns to the facts of this case as based on the evidence within the administrative record, the Hearing Officer's decision, the hearing transcripts, various administrative exhibits introduced by both parties, and D.H.'s relevant IEPs.[3]

#### i. Student's Needs

D.H. is a resident of the Pottstown School District. He entered a District school, Barth Elementary School ("Barth"), for first grade, but transferred to another District school, Rupert Elementary School ("Rupert"), from approximately the middle of first grade to April of second grade. He began experiencing behavioral difficulties there, and in the spring of 2015, Plaintiff requested that D.H. be returned to Barth. He was. And, although he exhibited difficulties with tasks and his behavior, he advanced to third grade with his peers.

In September 2015 when D.H. was starting third grade, the District provided Plaintiff with an evaluation report, classifying D.H. with Emotional Disturbance and finding him eligible

---

[3] The facts in this section are drawn largely from the Hearing Officer's factual findings. The record in this case is voluminous, with administrative hearings before the Hearing Officer that were conducted over six sessions. The Court has reviewed all the evidence submitted in this case by the parties. However, the Court does not find it necessary or helpful to include discussion of each witness' testimony, or all pieces of evidence that have been submitted. The fact that a particular witness's testimony is not discussed or is not discussed in great depth is in no way an indication that the testimony was ignored.

for special education. The report found a high degree of emotional and behavioral problems and recommended small group and individualized instruction "as much as possible."

In October 2015, the District convened an IEP meeting, during which Plaintiff requested one-to-one support during the school day at Barth, which the District did not provide, and the District recommended full-time emotional support at Rupert, but Plaintiff was unwilling to return her son there. The District recommended that medication could be an option, which Plaintiff interpreted as an ultimatum requiring either medication or D.H.'s placement outside the District or at Rupert. The District maintains it did not express such an ultimatum. The District provided an IEP (updated in December 2015) that placed D.H. in general education with itinerant learning support, provided for small-group instruction for social and coping skills, and included a behavioral support plan and reading and writing goals.

In February 2016, the District convened an IEP meeting. The team members, including Plaintiff, were pleased with D.H.'s progress. By the end of third grade, D.H. passed all his subjects and made significant progress in IEP goals, though in May 2016 he exhibited an increase in negative and aggressive behavior.

D.H.'s inappropriate behavior began to escalate at the start of fourth grade in the fall of 2016. He continued to receive services as provided in the December 2015 IEP, but his doctors changed his medication regime more than once and he was off medication for more than one week. The District assigned a paraprofessional to assist D.H., first for two days per cycle, and then increasing to four days and then to daily by November 2016.

The District attempted to schedule an IEP meeting in October 2016, but because of Plaintiff's work obligations and her desire to be assisted by an advocate, she was unable to participate on the proposed dates.

On or about October 24, 2016, D.H. engaged in loud and potentially destructive behavior, leaving the classroom, shoving furniture, and causing a "lockdown" of classrooms. The District personnel, including the principal and school psychologist, attempted to de-escalate and calm him but they were unsuccessful for approximately 30 minutes. Eventually, unable to control D.H.'s behavior, someone at the District called an ambulance and sent him to a local hospital. Ryan Oxenford, a District educator and mandated reporter under the law, called ChildLine at the Office of Children and Youth (OCY) out of a concern about D.H.'s behavior and the possibility that he was not receiving his prescribed psychiatric medication. Plaintiff was unhappy about the incident, hospitalization, and report to OCY. OCY ultimately found the report of "suspected child abuse and neglect" to be "unfounded."

Plaintiff understood that D.H. was not allowed to return to school, though he was not suspended, because his crisis plan would need to be changed. On October 25, Plaintiff came to the school and expressed her anger about the preceding day's events, including to the principal and the school psychologist. On October 26, the District held an IEP meeting. Plaintiff participated but disagreed that it was an IEP meeting because she believed she had received inadequate notice.

D.H. returned to school the next day, but his behavior in the following months became more disruptive, both in frequency and in the intensity of his outbursts. District personnel followed the IEP crisis plan in several instances, but other times failed to follow the sequence of notifications, at times calling the police before reaching Ms. Aponte because D.H. was exhibiting dangerous behaviors. District personnel became aware of some errors in contact information for other individuals listed in the crisis plan and changed those contacts without an IEP meeting or prior notice to Plaintiff.

On or about February 8, 2017, D.H.'s behavior escalated, and the principal bypassed the crisis plan and called the police. From February 13 to May 8, 2017, D.H. stopped attending the District elementary school, and Plaintiff enrolled him in a day treatment program. The day treatment program did not notify the District to send schoolwork to D.H., and the District did not contact the program to make such arrangements. During part or all of this period, the parties were attempting to find a mutually agreeable private placement and a settlement of Plaintiff's grievances.

On or about April 17, Plaintiff filed a complaint with the Pennsylvania Department of Education's Bureau of Special Education, alleging that the District failed to comply with the crisis plan, revised the IEP without Plaintiff's participation, and failed to provide a FAPE to D.H. while he was in the day treatment program. The Bureau made findings, including that the District failed to update D.H.'s behavior plan and had revised the crisis plan without Plaintiff's agreement, and ordered that the District provide D.H. with 22 hours of compensatory education services. The District performed all corrective actions.

On or about April 24, 2017, the District convened an IEP meeting, but Plaintiff was unable to participate due to a series of miscommunications. In the meeting, the District decided to offer D.H. full-time emotional support, and conveyed this offer to Plaintiff in a May 2, 2017 letter. Plaintiff rejected the offer because D.H. was to be placed in Rupert, the elementary school from which she had removed him in the spring of 2015.

D.H. returned to Barth on or about May 8, 2017 and was given a reduced workload. He completed fourth grade but made minimal progress on IEP goals and attained lower grades than he had in third grade. Given his disruptive behavior, the District maintained that he needed full-time emotional support.

In July 2017, the IEP team met and revised the behavior support plan to address behavioral concerns, including changing D.H.'s placement to include full-time emotional support for all academics and IEP goals. Plaintiff did not agree to the full-time emotional support placement, so D.H.'s last agreed-upon placement remained itinerant learning support.

D.H.'s dangerous behavior continued to escalate, including standing on a staircase railing. On September 27, 2017, D.H. picked up scissors and gestured threateningly toward staff. Staff followed the crisis plan, and subsequently D.H. was suspended for 10 days. At a manifestation meeting on October 6, Plaintiff maintained that the incident was due to the District's failure to follow the IEP, but the District concluded that D.H.'s wielding of scissors constituted possession of a weapon and authorized placement in a 45-day alternate setting. Instead of placing D.H. in a placement right away, the District agreed with Plaintiff to find an alternate private placement that would be acceptable to both parties. The District's behavior analyst also provided a full behavioral assessment and crisis support plan to address D.H.'s most concerning behaviors.

D.H. started the 45-day placement at Cottage Seven Academy ("Cottage Seven") on October 24, 2017.[4] The placement provided a higher degree of behavioral support and smaller classes, which the District thought would give D.H. better learning opportunities in light of his disorder and behavioral history. On his first day, D.H. exhibited dangerous and threatening behavior during a meltdown, but staff brought him under control and Plaintiff was not called. Plaintiff maintains that Principal Brett Wade inappropriately restrained D.H. during the incident,

---

[4] The parties initially agreed that D.H. would start at Martin Luther School in Plymouth Meeting, Pennsylvania on October 23. The District failed to complete certain paperwork on time, so instead the District arranged for D.H. to enroll at Cottage Seven, another private school.

in contravention of the IEP.

The next day, October 25, D.H. again behaved dangerously toward himself and others, including throwing rocks at a car. Wade contacted several District officials and the police. Ultimately, when D.H. could not be calmed and Plaintiff refused to retrieve him from Cottage Seven, D.H. was taken to a police station and held there for several hours until Plaintiff came to get him. At some point, OCY was called.[5] District personnel conveyed to Plaintiff that her son could return to school if his crisis plan were revised. By October 26, both the District supervisor of education and the director of special education directed Wade to comply with the crisis plan and assured Plaintiff that D.H. could return to school.

At a November 2 IEP meeting, the District offered an annual IEP for D.H., including completion of the 45-day alternative education placement with full-time emotional support until December 19 and then a return to D.H.'s neighborhood middle school with supplemental emotional support and a positive behavior support plan. Plaintiff rejected the proposed IEP and requested a due process hearing.

On November 30, D.H.'s behavior was out of control and he had to be restrained. The District proposed IEP meeting dates to review the incident and sought parental permission to re-evaluate D.H.. By the end of the 45-day placement, D.H.'s behavior had improved and he returned to the District middle school in December 2017, with full-time emotional support.

The District continued to offer a variety of placements to address D.H.'s educational and behavioral needs. In December 2017, the District offered an IEP with full-time emotional

---

[5] There is some dispute as to who contacted OCY. The Hearing Officer found "no evidence that this call was made by District personnel, and the District denie[d] calling the child protective agency." Deposition testimony suggests Detective Heather Long made the call.

support to facilitate the process of finding a private placement, but Plaintiff rejected a Notice of Recommended Educational Placement (NOREP) for Extended School Year services and requested a due process hearing. In March 2018, the District issued a NOREP offering placement in a specific private school, but Plaintiff did not sign the NOREP. The following month, Plaintiff indicated an intention to enroll D.H. in a cyber charter school.

### ii. Due Process Hearing

Plaintiff's two due process complaints were consolidated by Hearing Officer William Culleton for all purposes. He held hearings on January 3, January 25, February 28, March 14, April 20, and April 30, 2018. The District was represented by counsel, with Plaintiff appearing *pro se*.

During the hearings, 15 witnesses testified, including Plaintiff; Oxenford, the principal of Barth; Erin Jacobs, the District's director of special education; Meaghan Walsh, a District special education teacher for third and fourth grade; Amanda Fraterman, the District's out-of-district coordinator; and Jay Schroeder, the District supervisor for secondary special education. Brett Wade, the principal of Cottage Seven, did not testify.

### iii. Hearing Officer's Decision

On May 11, 2018, the Hearing Officer rendered a 46-page opinion with findings of fact and legal analysis. He evaluated:

(1) whether D.H.'s current school placement was appropriate;

(2) whether the placement was the least restrictive appropriate placement;

(3) whether placement in a full-time emotional support program in an approved private school or other private school was appropriate;

(4) whether the District offered and provided a FAPE from January 16, 2016 to April

30, 2018;

(5) whether the District offered and provided all appropriate supplementary aids and services from January 16, 2016 to April 30, 2018;

(6) whether the District offered and provided appropriate one-to-one paraprofessional or aide services from March 11, 2015 to January 16, 2016;

(7) whether the District retaliated against D.H. or Plaintiff by calling the police or notifying a child protection agency from January 16, 2016 to April 30, 2018;

(8) whether the District impeded Plaintiff's opportunity to participate in the decision-making process regarding the provision of a FAPE from January 16, 2016 to April 30, 2018; and,

(9) whether the District should be ordered to provide compensatory education services.

The Hearing Officer found for the District, concluding that the District's then-current offers of educational services were appropriate and that the District had, at all relevant times, offered D.H. a FAPE in the least restrictive setting and with appropriate supplementary aids and services. Additionally, he concluded that the District had not retaliated against either D.H. or Plaintiff, and given that Plaintiff had been "advocating vigorously for her child for years" and the police and child services had been contacted only a few times, there was no "unusually suggestive temporal proximity," as required for a retaliation finding. Finally, he found that the District did not impede Plaintiff's participation in educational planning "to a significant extent."

### iv. Procedural History

On July 27, 2018, Plaintiff filed this Complaint challenging various aspects of the Hearing Officer's decision. She filed an Amended Complaint on August 2, 2018 and, following the Court's grant of the District's motion to dismiss, filed a Second Amended Complaint on January 31, 2019. The District again filed a motion to dismiss, which was granted in part and denied in part. *See Aponte v. Pottstown Sch. Dist.*, 2019 WL 3080938 (E.D. Pa. July 12, 2019).

Plaintiff's IDEA and Section 504 retaliation claims against the District survived. *Id.* at *10.

The District's motion for judgment on the administrative record or, in the alternative, summary judgment is now before the Court.

## II. STANDARDS OF REVIEW

### A. IDEA

"Judicial review in IDEA cases differs substantively from judicial review in other agency actions, in which the courts are generally confined to the administrative record and are held to a highly deferential standard of review." *Susan N. v. Wilson Sch. Dist.,* 70 F.3d 751, 757 (3d Cir. 1995). Specifically, a district court applies a "modified de novo" standard in reviewing the decision of a Hearing Officer. *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003). In doing so, the court (1) receives the records of the administrative proceedings; (2) hears any additional evidence if requested by a party; and (3) basing its decision on the preponderance of the evidence, grants any relief it deems appropriate. 20 U.S.C. § 1415(i)(2)(C). Findings are made "by a preponderance of the evidence," but "due weight" is afforded to the Hearing Officer's determination." *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004).

> Under this standard, factual findings from the administrative proceedings are to be considered prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why. In addition, if a state administrative agency has heard live testimony and has found the testimony of one witness to be more worthy of belief than the contradictory testimony of another witness, that determination is due special weight. Specifically, this means that a [d]istrict [c]ourt must accept the state agency's credibility determinations unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion.

*Id.* (internal quotations, citations, and alterations removed). The modified *de novo* standard "is by no means an invitation to the courts to substitute their own notions of sound educational

policy for those of the school authorities which they review." *Bd. of Educ. of Hendrick v. Rowley,* 458 U.S. 176, 206 (1982).

In reviewing the decision of a special education administrative hearing, a district court may consider additional evidence beyond that found in the administrative record. 20 U.S.C. § 1415(i)(2)(C)(ii). The decision to admit or exclude supplemental evidence is within the court's discretion. *Susan N.*, 70 F.3d at 760. Before admitting or excluding additional evidence, a court must evaluate it and "determine whether the party introducing the additional evidence has presented a sufficient justification for not proffering the evidence at the administrative hearing." *Antoine M. v. Chester Upland Sch. Dist.*, 420 F. Supp.2d 396, 403 (E.D. Pa. 2006) (citing *Susan N.*, 70 F.3d at 760). Only supplemental evidence that is "relevant, non-cumulative and useful in determining whether Congress' goal has been reached for the child involved" is admissible. *Susan N.*, 70 F.3d at 760. If the supplemental evidence offered is the type of evidence that a court might exclude in a conventional civil case, it should not be admitted. *Id.* at 759.

## B. Section 504

The Third Circuit has not made clear whether Section 504 retaliation claims related to IDEA claims are evaluated under a judgment on the administrative record standard (like IDEA claims) or under the standard for a motion for summary judgment.

Defendants rely on *Batchelor v. Rose Tree Media S.D.*, 759 F.3d 266, 274 (3d Cir. 2014) to argue that "the same level of deference [should be given] to the administrative law judge on Section 504 claims that [is] give[n] with respect to IDEA claims." In *Batchelor*, the Third Circuit considered a student's claim for denial of a FAPE and his mother's related Section 504 claim for the district's alleged retaliation against her for advocating on behalf of her son—the

same fact pattern at issue here. *See* 759 F.3d at 269-70. The Circuit held that the IDEA's exhaustion requirement applied to Section 504 retaliation claims that arise in situations that "relate unmistakably to the provision of a FAPE." *Id.* at 274 (internal quotations omitted). The Third Circuit has also linked IDEA and Section 504 claims in other ways, holding that the IDEA's two-year statute of limitations applies to education-related claims under Section 504. *See P.P.*, 585 F.3d at 737; *see also D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 253 n.8 (3d Cir. 2012) (finding that district did not deny student a FAPE was "equally dispositive" of student's Section 504 claim); *Marissa F. v. The William Penn Sch. Dist.*, 2005 WL 2304738 (E.D. Pa. Sept. 20, 2005) (same).

Defendants argue that for the *Batchelor* decision to have any meaning, trial courts must give some deference to the Hearing Officer's findings in Section 504 claims—otherwise, the Third Circuit would be requiring plaintiffs to exhaust administrative remedies on those claims but allowing trial courts to ignore the administrative findings. This reasoning is sound. Particularly because the Hearing Officer here conducted six hearings and made extensive findings, including on Plaintiff's Section 504 claims, the Court will review those findings under the modified *de novo* standard.

## III.    DISCUSSION

In an IDEA case, the aggrieved party challenging the Hearing Officer's decision in district court bears the burden of persuasion. *See Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012).

As a threshold matter, nowhere in her Complaint or briefing does Plaintiff cite to any specific portion of the Hearing Officer's opinion or denote the opinion's alleged errors, leaving the Court to guess what exactly she is challenging. *See, e.g., K.S. v. Hackensack Bd. of Ed.*,

2017 WL 788207, at *8 (D.N.J. Mar. 1, 2017) (dismissing IDEA claim for failure to "plausibly

plead the alleged deficiencies" in hearing officer's decision); *Banks v. Dist. of Columbia*, 811 F.

Supp. 2d 242, 244 (D.C. Cir. 2011) (finding parent had not carried her burden where she

"argue[d] generally that the Hearing Officer should have credited her witnesses").

Giving the utmost consideration to Plaintiff's *pro se* status, the Court moves beyond this

hurdle and attempts to first discern and then evaluate Plaintiff's arguments.  *See Erickson v.*

*Pardus*, 551 U.S. 89, 94 (2007) (requiring *pro se* filings "to be liberally construed").[6]

## A.  FAPE Denial

In her own words, the thrust of Plaintiff's challenge to the Hearing Officer's finding that

there was no FAPE denial, is: "I do not agree that these witnesses were credible nor do I agree

with decision in its entirety" and "[d]uring the Due Process hearing, the defendants' witnesses

made falsifying testimony (lied) on many issues."  In her Complaint, Plaintiff alleges Jacobs lied

during an ODR hearing; Kim Stilwell "lied numerous time after being questioned"; and "J.

---

[6] Plaintiff also makes several arguments related to the hearings.  She suggests there is "evidence such as testimony from a school board member, which was not available at the due process hearing, that clearly confirms plaintiff's allegations of racial discrimination from the administration and staff in the Pottstown School District."  In support of this argument, Plaintiff has attached Exhibit H, which contains, in part, a Facebook message from Pottstown School Board Director Kurt Heidel to Plaintiff that says, "[Y]ou are correct that there has been serious issues with regards to special education, and interactions between the teachers and administration over behavior and race.  The board hasn't been made aware of much of it until recently, and I am surprised how much has been kept from us."  Even assuming *arguendo* that the Court admits this evidence because it came about after the administrative hearings, Exhibit H does not support Plaintiff's argument.  The Facebook message, without more, is far too attenuated from Plaintiff's case to suggest that Defendants here acted in a racially prejudiced manner and thereby denied D.H. a FAPE.

Relatedly, Plaintiff asserts that Jacobs engaged in "witness tampering" with Wade before the hearing, but presents no evidence to support this claim.  Finally, Plaintiff alleges that "[m]any things were said and done 'off the record[,]'" which the Court construes as an allegation that the hearing proceedings were somehow improper.  In support of this, she cites to an email chain between herself, the Hearing Officer, and the District's counsel, in which Plaintiff says she has not received all relevant school records and asks whether conference calls are recorded; the Hearing Officer says they are not.  The Court finds that this email chain is not evidence of impropriety.  The IDEA's procedural safeguards speak to "the right to present evidence and confront, cross-examine, and compel the attendance of witnesses."  20 U.S.C. § 1415(h)(2).  Plaintiff has put forth no evidence to suggest that the Hearing Officer deprived her of these rights.

Schroeder also lied @ due process hearing." In her opposition brief, Plaintiff alleges Jacobs and

Schroeder lied about why D.H. did not attend Martin Luther and was instead placed into Cottage

Seven. She does so without citing to any evidence, beyond an email from her to ODR alleging

that "a witness lied on multiple counts, which I can prove, thus committing perjury."

Regarding the credibility of witnesses, "the Court generally relies on the Hearing Officer

who is in the best position to observe the witness." *J.E. v. Boyertown Area Sch. Dist.*, 834 F.

Supp.2d 240, 253 (E.D. Pa. 2011); *see also Cty. Sch. Bd. of Henrico Cty. v. Z.P. ex rel. R.P.*, 399

F.3d 298, 307 (4th Cir. 2017) (finding a hearing officer is not required to explain in detail why

he credits certain witnesses). As the First Circuit has cautioned, "The court should look with a

critical eye on a claim, such as made here, that the credibility of a witness is a central issue."

*Town of Burlington v. Dept. of Educ.*, 736 F.2d 773, 791 (1st Cir. 1984); *see also J.E.*, 834 F.

Supp.2d at 256 ("Courts have been cautioned against supplanting the Court's judgment for that

of the state agency, with expertise in the field."). Here, the Hearing Officer's decision explicitly

addressed the issues of credibility and reliability:

> Both parties challenged the credibility of various witnesses, both directly and by
> implication. Carefully considering each witness in view of these challenges, I
> found no evidence to impugn the credibility or sincerity of Parent or any District
> witnesses. . . . I found all District witnesses to be credible, based upon the
> substantial consistency of their testimony with the documentary and testimonial
> record, their demeanor under oath, and their ways of responding to various
> questions.

Given this backdrop and the absence of new evidence discrediting Jacobs and Schroeder,[7] there

is no reason to disturb the Hearing Officer's findings based on their credibility.

"[F]actual findings from the administrative proceedings are to be considered prima facie

---

[7] Stilwell did not testify at the hearings, and the Hearing Officer made no reference to her in his decision.

correct[,] and the Court "must accept the state agency's credibility determinations unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." *Shore*, 381 F.3d at 199. Plaintiff has put forth no such evidence here. Indeed, the record supports the Hearing Officer's factual findings that the District tried to work with Plaintiff and his legal conclusions that the District's actions did not constitute denial of a FAPE. The District motion for judgment on the administrative record on this issue shall be granted.

### B. Section 504 Retaliation

Plaintiff also argues that the District called OCY on her in October 2016 and October 2017 in retaliation for her advocating for D.H.'s FAPE, and that the Hearing Officer's findings to the contrary should be overturned. Each incident is addressed in turn.

#### i. *October 2016 Report*

By way of recap, on or about October 24, 2016, D.H. engaged in loud and potentially disruptive behavior, eventually leading the District to call an ambulance and Ryan Oxenford, a District educator and mandated reporter under the law, to call OCY, out of a concern about D.H.'s behavior and a possibility that he was not received his prescribed psychiatric medication. The Hearing Officer heard testimony from Oxenford and found him credible. Plaintiff does not dispute this but instead argues that Meaghan Walsh, a District special education teacher who also testified at the hearing and whom the Hearing Officer also credited, lied in her testimony. Thus, Plaintiff's sole argument in support of her October 2016 retaliation claim is that Walsh "lied about [Kizmect Meade, a family peer support partner at Mental Health Partnerships] suggesting that student be placed on medication" and caused the District to make a ChildLine report on the inaccurate assumption that D.H. was off his medication for improper reasons.

Plaintiff produced a single exhibit, Exhibit B, as evidence of this alleged lie.[8]  Exhibit B is an April 2018 email from Plaintiff to Meade, stating that Walsh testified that Meade recommended putting D.H. on medication.  Meade responds that she has "NEVER given a parent a suggestion for or against medication" (emphasis in original).  Walsh's testimony on this topic spans many pages and features objections from Plaintiff and interjections from the Hearing Officer.  Walsh described an IEP meeting in which she, Plaintiff, and Meade discussed options to help D.H. in school, one of which she understood to be putting D.H. on medication:

> [T]here was a point in the conversation where [Meade] stated to [Plaintiff], "What can we do at home to help [D.H.] in school?  Because the School is providing all that they can." . . . And one of those things were the option of medication.

Contrary to Plaintiff's assertions, Walsh never stated that Meade said D.H. had to be on medication.  To the contrary, when asked "Did anyone from the District tell Parent at that meeting that [D.H.] had to be on medication in order to stay at Barth?", Walsh answered, "No."  The information found in Plaintiff's Exhibit B is insufficient to overturn the Hearing Officer's findings.

Moreover, the Hearing Officer's retaliation analysis did not turn on Walsh's testimony.  Indeed, the analysis reflects the ambiguity about what happened, stating that "[t]he testimony shows that . . . it seemed to Student's team and principal that Student's medication changes might be due to parental negligence.  Although the record does not raise a reason to doubt the sincerity of these concerns, neither does it support an inference of parental negligence."  Furthermore, Oxenford, who made the ChildLine report, testified extensively about what motivated him to do so.  He believed that D.H.'s behavior, which he witnessed, met the criteria

---

[8] Exhibits refer to attachments to Plaintiff's opposition brief.  *See* ECF No. 86.

of "potential serious mental injury," which he as a mandated reporter had to report, even if it his belief was based on a suspicion rather than actual proof. His understanding from conversations with staff was that D.H. "had stopped takings medications." He also factored in that the Emergency Medical Technicians—"another set of eyes" —witnessed that Student was "inconsolable." Ultimately, he testified,

> I made the report because he was exhibiting some behavior that was inconsolable, that was very atypical that was dangerous to himself and others. And one of the factors in the situation was that he was inconsistently on medicine that he was prescribed, and we had seen a history where the medication had helped with him being more successful.

Oxenford admitted that he did not know why Student stopped taking the medication—whether it was because of medical advice, or Plaintiff's decision, or both.

The Hearing Officer found Oxenford credible and concluded,

> [T]here is no evidence that would support a finding that District personnel harbored hostility or intent to threaten Parent. There is no evidence that District actions were calculated to inhibit Parent's participation in educational decisions; indeed, the District routinely invited Parent to meetings and invited Parent to communicate with them about even the incidents in which police and child protective agencies were called.

After a thorough review of the record, the Court agrees with the Hearing Officer and finds that Oxenford and other District personnel were sincerely concerned about D.H.'s wellbeing. There is no indication that the October 2016 ChildLine report was animated by retaliatory impulse.

### ii.  October 2017 Call

To recap the October 25, 2017 incident, D.H. behaved dangerously toward himself and others during his second day at the Cottage Seven placement, which led to the police and OCY being called. Plaintiff maintains that Brett Wade, the principal of Cottage Seven, placed the OCY call in retaliation against her. Although Wade did not testify at the hearing, various

District representatives who were on the scene that day did, including: Erin Jacobs, the District's director of special education; Amanda Fraterman, the District's out-of-district coordinator; and Jay Schroeder, the District supervisor for secondary special education who referred D.H. to the Cottage Seven placement. The Hearing Officer credited their testimony and found no evidence that Wade or District personnel made the OCY call. In depositions, the responding police officers who were on the scene following D.H.'s outburst testified that Detective Heather Long, who handles juvenile matters in Pottstown, called OCY.

Plaintiff, in support of her position, points to the fact that Wade did not testify in the hearing and that there is "no direct evidence, written or otherwise, from OCY stating who in fact made the call to OCY that day." But at the due process hearing and in this case, the burden is on Plaintiff to produce evidence of retaliation and, so, this propositions are not dispositive. *See Ridley*, 680 F.3d at 270.

Plaintiff also attaches two exhibits in support of her retaliation argument. Exhibit G is a letter detailing the Bureau of Special Education's investigation of the October 2017 events, finding the District at fault because it failed to contact all the parties listed in the crisis plan on October 24 and telling the student of an intention to call law enforcement on October 25. Plaintiff contends that because Wade had the crisis plan, calling the police "can be construed as malicious and retaliatory." The Hearing Officer considered this evidence and wrote a section of his opinion on the District's failure to follow the crisis plan on several occasions, concluding that there was no evidence to show that deviations from the crisis plan impeded D.H.'s education or Plaintiff's participation in his educational planning, and thereby it did not constitute the denial of a FAPE. While the Hearing Officer's retaliation section did not address Exhibit G explicitly, this Court finds that Exhibit G is not evidence of retaliation.

Relatedly, Exhibit K is an October 2017 email chain between Plaintiff and Wade, which Plaintiff uses to argue that Wade was upset with her and the need to modify the crisis plan, thereby providing a motive for his alleged retaliation. To the contrary, Wade's email says he appreciates Plaintiff "reaching out to express [her] concerns[,]" explains that the time of the incident D.H. was behaving in a violent manner and "posed a serious threat to everyone in the building and "[i]n regards to the crisis plan, has behavior had already escalated to the point of physical restraint." He notes that the "current crisis plan is not acceptable going forward" and suggests "you keep your son home until we can sort this issue out" but if another similar incident occurs, he is "obligated to follow the same practices that we did to handle the first one." Neither the District nor Plaintiff presented this correspondence at the hearing, even though it was available at the time. Regardless, it does not show retaliatory intent or indicate that Wade influenced Detective Long to call OCY.

Plaintiff has not pointed to anything in the administrative record or provided additional evidence to the Court to disturb the decision of the Hearing Officer. The District's motion for judgment on the administrative record for the Section 504 retaliation claims is granted.

An appropriate order follows.

**February 27, 2020**                                                                 **BY THE COURT:**

                                                                                      **/s/Wendy Beetlestone, J.**

                                                                                      ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

                                                                                      **WENDY BEETLESTONE, J.**